26 P.3d 1136

STATE of Arizona, Appellee,

v.

Darrel Peter PANDELI, aka Darrel Peter Florian, Appellant.

No. CR 98–0376–AP.

Supreme Court of Arizona.

July 17, 2001.

Janet Napolitano, Attorney General, by Paul J. McMurdie, Criminal Appeals Chief Counsel and Kent E. Cattani, Assistant Attorney General, Phoenix, Attorneys for Appellee.

J. Douglas McVay, Phoenix, Attorney for Appellant.

## OPINION

JONES, Vice Chief Justice.

¶ 1 Defendant Darrel Peter Pandeli (defendant) was convicted by a jury of first degree murder and was sentenced to death by the trial judge. The case is before us on direct review, pursuant to Rules 26.15 and 31.2 of the Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to article VI, § 5(3) of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) §§ 13–4031 (1989) and 13–703.01 (Supp.1999).

## PROCEDURAL HISTORY

¶ 2 The State charged defendant with two counts of premeditated murder: count one for the murder of Teresa Humphreys and count two for the murder of Holly Iler. Humphreys was murdered more than a year before Iler. The two counts were severed for trial.

¶ 3 In February 1996, a jury convicted defendant of second degree murder for the Humphreys death. The trial court sentenced him to twenty years in prison. Defendant appealed the conviction, and the court of appeals affirmed. This appeal pertains exclusively to the conviction and sentence in the Iler case.

¶ 4 Defendant's trial for the Iler murder commenced in June 1997. At the close of the State's case, defense counsel moved for a directed verdict on premeditated murder, arguing that no evidence of premeditation existed and asking the trial court to allow the jury to consider only second degree murder and its lesser-included offenses. The trial court denied the motion. Defendant did not testify, and defense counsel presented no evidence because defendant did not contest the allegation that he killed Iler. He challenged only the element of premeditation in connection with the murder charge.

¶ 5 The jury, instructed on both first and second degree murder, returned its verdict July 2, 1997, convicting defendant of first degree murder. The sentencing hearing lasted eight days. The trial court heard testimony and argument on all sentencing issues and, on July 15, 1998, handed down its Special Verdict sentencing defendant to death.

## FACTS

¶ 6 On September 23, 1993, defendant and his friend, Mark Cowan, went to a bar in Phoenix where they consumed beer. After the bar trip, the two proceeded to a K Mart store where Cowan purchased a shirt. Cowan changed his clothes and left his shirt, shoes, and deodorant in the defendant's van. They then met defendant's brother Chris Pandeli and another friend at a restaurant at the Arizona Center in Phoenix and remained there for several hours. At about 10:15 p.m., Chris and Cowan left for another bar. Defendant stayed at the Arizona Center. At approximately 11:45 p.m., defendant again met Chris and Cowan and asked his brother to give Cowan a ride home. Cowan slept at Chris' apartment that night.

¶ 7 At about 2:00 a.m., defendant's roommate, Louis Russo, arrived home and found defendant cleaning his van and washing his clothing. Defendant had removed the mattress from his van. Russo testified that defendant told him he was cleaning the van because someone spilled a strawberry soda inside and that defendant appeared sober but upset, excited, and stressed.

¶ 8 The next morning, Holly Iler's nude body was found in an alley near the defendant's residence. Among other injuries, her throat had been slashed and the areolae and nipple parts of her breasts excised.

¶ 9 The same morning, Cowan asked Chris to take him to defendant's house to retrieve his clothing from the van. They arrived at about 7:30 a.m. and found the defendant outside. Still tired, Cowan asked defendant if he could sleep in the van, and defendant permitted him to do so. After approximately ninety minutes, defendant woke Cowan and told him the police were investigating the death of a woman whose body was found down the street. Cowan drifted back to sleep, but defendant woke him again and asked whether Cowan knew what an RV van marked "Phoenix Mobile Command" would be doing at a crime scene. Cowan told defendant he presumed it was a mobile crime laboratory. Defendant then asked Cowan if the police had the ability to detect tire tracks or identify other types of tracks, and Cowan responded that the police could take impressions and pictures of tracks.

¶ 10 Shortly thereafter, defendant and Cowan left to run errands. When defendant dropped Cowan off at a motel, he gave Cowan his clothing from the van, but the shirt and one sock were missing. After showering at the motel, Cowan noticed red spots on his shoes and deodorant stick that were not present when he left them in defendant's van the night before. Cowan became suspicious that defendant was somehow involved in the death of the woman whose body had been discovered and watched for television reports of the crime. When he saw a report describing the victim, his suspicion heightened because the description resembled a woman with whom defendant had socialized the night before at the Arizona Center. Though it was not the same woman, Cowan thought it might be.

¶ 11 That evening, the defendant, Cowan, Chris, and two other friends went to several bars. During the evening, Cowan noticed that defendant appeared subdued and quiet, more than was normally the case. Cowan returned to the motel at the end of the evening. The following morning, Cowan's suspicions of defendant's involvement in the woman's death caused him to call Silent Witness, an evidence gathering arm of the Phoenix Police Department. The police came to

question Cowan, who surrendered his shoes and deodorant stick to them for testing the red spots. The soles of Cowan's shoes matched prints found near the victim's body in the alley. Additionally, preliminary testing found the red spots on the shoes to be consistent with the victim's blood. Based on these facts, police obtained a search warrant for the defendant's residence and van and took him into custody.

¶ 12 Police detectives questioned defendant after giving him the *Miranda*[1] warning. He initially denied involvement in the murder. When questioned about the blood on Cowan's shoes, defendant told detectives that he walked outside early that morning and saw the body. He said he looked at the body and touched and moved it to see if any marks were on the victim's back. Defendant denied killing Iler and attributed the blood on his shoes to the morning contact with her body. He stated that he did not tell anyone about the body because he did not want to be blamed for the death. Defendant admitted removing and taking a ring and other items from the body.

¶ 13 A detective explained to the defendant that the police have equipment to detect traces of blood in a van that has been cleaned and on clothing that has been washed. At that point, defendant ceased his denials and stated that he wanted to confess the truth. He told the detective that he offered Iler a ride and she accepted. They stopped at a park near his residence where she agreed to have sexual intercourse in exchange for twenty dollars. He used a condom and attempted intercourse, but was unable to perform. He stopped trying and asked her to return his money.

¶ 14 Defendant claimed that Iler then became upset and pulled a knife. They struggled. He hit her in the chest four or five times and in the head three or four times, then slit her throat with a knife. After the killing, he amputated parts of her breasts, dumped the body in the alley, and placed her clothing in a nearby garbage container; he then returned to his residence and cleaned the van. Defendant admitted mutilating

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Iler's breasts after she was dead. He said he did it because he was angry. He first claimed to have thrown the excised breast parts into the garbage container, but later confessed to flushing them through the toilet in his residence. After confessing the Iler murder, defendant also confessed to having committed the earlier murder of Teresa Humphreys.

¶ 15 Police searched defendant's residence and van and located a Swiss Army knife, keys, a blood-stained rope, and a "fanny pack" purse that belonged to Iler. Police also obtained from a nearby garbage container, identified by the defendant, bedding, a T-shirt, a sock, and a condom.

¶ 16 Prior to trial, the State moved *in limine,* pursuant to Rule 404(b), Arizona Rules of Evidence, to admit portions of defendant's confession, including parts relating to Humphreys' killing. The trial court denied the motion, ruling that evidence pertaining to Humphreys' murder was inadmissible. Consequently, the State determined not to use any of defendant's confession in its case-in-chief, indicating during a bench conference that no part of the confession would be offered because the prosecution did not wish "to open the door" to some exculpatory statements.

¶ 17 Defense counsel filed a trial memorandum requesting that the court rule defendant's entire confession admissible as hearsay exceptions under Rules 803(3) and 804(b)(3), Arizona Rules of Evidence. The State objected. The trial court sustained the State's objection and excluded the confession.

## DISCUSSION

## I. TRIAL ISSUES

### A. ADMISSIBILITY OF DEFENDANT'S CONFESSION

■ ¶ 18 We review the trial judge's refusal to admit defendant's confession for abuse of discretion. *State v. LaGrand (Walter),*

153 Ariz. 21, 27, 734 P.2d 563, 569 (1987). Decisions to exclude such evidence remain within the sound discretion of the trial court and will be reversed on appeal only upon a showing of clear, prejudicial abuse. *State v. Ayala,* 178 Ariz. 385, 387, 873 P.2d 1307, 1309 (App.1994). "The prejudice must be sufficient to create a reasonable doubt about whether the verdict might have been different had the error not been committed." *Id.*

¶ 19 The statement, offered by the defendant to exculpate, was an out-of-court declaration and was thus inadmissible hearsay unless it fits within a recognized exception to the rule. Ariz. R. Evid. 801(c). This court has previously noted that the trustworthiness of a defendant's self-serving out-of-court statement was "highly suspect." *State v. Smith (Robert),* 138 Ariz. 79, 84, 673 P.2d 17, 22 (1983). Defendant advanced two possible hearsay exceptions which we address in turn.

### 1. RULE 804–Statement Against Interest

¶ 20 Rule 804(b)(3) reads:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement against interest. . . .* A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. (Emphasis added.)

■ ¶ 21 The rule sets forth three requirements for admissibility: (1) the declarant must be unavailable; (2) the statement must be against the declarant's interest; and (3) there must be corroborating evidence that indicates the statement's trustworthiness. All three must be satisfied. *State v. Henry,* 176 Ariz. 569, 575, 863 P.2d 861, 867 (1993); *see also LaGrand,* 153 Ariz. at 27, 734 P.2d at 569.[2] If a non-defendant declarant asserts

2. The State correctly asserts that the *"LaGrand* test" should apply only to cases in which someone other than the defendant is the declarant because a defendant's "self-serving" statements are always "highly suspect." The express word-

ing of the rule is consistent with this argument since it refers with particularity to any statement which tends to "expose the declarant" and at the same time "exculpate[s] the accused. . . ." Under this wording, the declarant must be one person

the Fifth Amendment privilege against self-incrimination, he is deemed unavailable as a witness. *See State v. Lopez,* 159 Ariz. 52, 54, 764 P.2d 1111, 1113 (1988) (defendant successfully sought admission of roommate's statements pursuant to Rule 804(b)(3) after roommate asserted Fifth Amendment privilege).

¶ 22 Here, the defendant *is* the declarant seeking admission of his own statements to police without taking the stand to testify. The State contends the defendant cannot refuse to testify and yet offer his own hearsay statements for the record. "When offered by the defendant, his out-of-court declarations are not subject to cross-examination by the prosecution. Therefore, such statements are appropriately inadmissible unless offered, not to prove the truth of their content," but for some other admissible purpose. *King v. Commonwealth,* 18 Va.App. 57, 441 S.E.2d 704, 705 (1994) (finding reliability of out-of-court statement as "the principal rationale underlying the hearsay rule").

¶ 23 "Unavailability" means that the party seeking admission of the statement cannot compel the declarant to testify. Defendant is not "unavailable" to himself and has the ability and the right to testify. Should he decline by asserting his Fifth Amendment privilege, he may not then seek to introduce his statement to police yet at the same time avoid cross-examination under oath and impeachment. The trial court correctly ruled that when a defendant proffers his own confession for exculpatory purposes, the statement constitutes inadmissible hearsay not in compliance with Rule 804(b)(3).

### 2. RULE 803–State of Mind

¶ 24 For a hearsay *statement to be* admissible under the Rule 803(3) exception, it must be "[a] statement of the declarant's *then existing* state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Ariz. R. Evid.

803(3) (emphasis added). Defendant's statement to police two days *after* the crime, that he felt threatened by the victim, fails to qualify as present "state of mind" under this hearsay exception because the statement described a *prior* mental state, not a present mindset. *State v. Barger,* 167 Ariz. 563, 566, 810 P.2d 191, 194 (App.1990) (emphasis added).

¶ 25 In *State v. Fulminante,* this court held that "the statement must describe declarant's present feeling or future intention rather than look backward, describing declarant's past memory or belief about another's conduct." *Id.,* 193 Ariz. 485, 495, 975 P.2d 75, 85 ¶ 32 (1999). The statement must be directed solely at the declarant's present state of mind, rather than constitute a narrative of prior factual events that created an earlier state of mind. *Id.*

¶ 26 Defendant's statements that he and the victim disrobed in the back of the van, that he became angry when he could not perform sexually and the victim refused to return the money, that she pulled a knife and defendant took it from her, and that he excised breast parts because of his anger described neither present feeling nor future intent. The statements contain nothing more than asserted memory of past events and fail to meet the requirements of Rule 803(3). The trial court did not abuse its discretion in excluding the confession as inadmissible hearsay pursuant to Arizona Rule of Evidence 801(c).

### B. REFUSAL TO GRANT THE MANSLAUGHTER INSTRUCTION

¶ 27 Defendant claims the jury should have been instructed on the lesser-included offense of manslaughter. The court must instruct the jury on every lesser-included offense to the offense charged, provided that the evidence supports the instruction. *State v. Amaya–Ruiz,* 166 Ariz. 152, 174, 800 P.2d 1260, 1282 (1990). The trial court in *Amaya–Ruiz* instructed the jury, as here, on first and second degree murder but, in the absence of supporting evidence, refused to give the requested manslaughter instruction. We

and the accused another. Where the declarant and the accused are one and the same, the admissibility requirements of Rule 804(b)(3) are not met.

held that when the court gives the jury proper first and second degree murder instructions, but refuses manslaughter, and the defendant is convicted of first degree rather than second degree murder, any error is harmless. *Id.* The jury, by implication, has rejected all lesser-included crimes. *See id.* (citing *State v. Ortiz,* 158 Ariz. 528, 764 P.2d 13 (1988)); *see also State v. Vickers,* 159 Ariz. 532, 542, ˙768 P.2d 1177, 1187 (1989) (any error in failing to give manslaughter instruction cured by first degree murder conviction while rejecting second degree); *State v. White,* 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985) ("[F]inding defendant guilty of the highest offense, to the exclusion of the immediately lesser-included offense, second degree murder, the jury necessarily rejected all other lesser-included offenses."). In the instant case, any error was harmless.

## II. SENTENCING ISSUES

¶ 28 In determining the appropriateness of a death sentence, we independently review the aggravation and mitigation findings of the trial court. A.R.S. § 13–703.01(A) (2001); *see, e.g., State v. Kayer,* 194 Ariz. 423, 432–33, 984 P.2d 31, 40–41 ¶ 28 (1999). Independent review by this court ensures that the death penalty is not imposed arbitrarily, is reserved for exceptional cases which satisfy statutory aggravation standards, and is the appropriate sanction for the crime in question. *State v. Bible,* 175 Ariz. 549, 606, 858 P.2d 1152, 1209 (1993). The court reviews the record to determine the presence or absence of aggravating and mitigating circumstances, as well as the weight to be accorded each circumstance. *State v. Bolton,* 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995) (presence or absence of factors); *State v. Ramirez,* 178 Ariz. 116, 128, 871 P.2d 237, 249 (1994) (weight given to factors).

¶ 29 Aggravating circumstances must be proven beyond a reasonable doubt. *Kayer,* 194 Ariz. at 433, 984 P.2d at 41 ¶ 28 (citing *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992)). Both statutory and non-statutory mitigating circumstances may be proven by a preponderance of the evidence. *State v. Djerf,* 191 Ariz. 583, 595, 959 P.2d 1274, 1286 ¶ 39 (1998) (citing *Brew-*

*er,* 170 Ariz. at 504, 826 P.2d at 801). When mitigation evidence is conflicting and entails considerations of credibility, we accord deference to the trial court's conclusions. *State v. Hoskins,* 199 Ariz. 127, 149, 14 P.3d 997, 1019 ¶ 97 (2000) (citing *State v. Milke,* 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993)). But we are independently responsible for weighing all factors to determine ultimately whether proven mitigating circumstances, measured separately or cumulatively, are sufficient to outweigh aggravating circumstances established on the record. *Kayer,* 194 Ariz. at 433, 984 P.2d at 41 ¶ 28.

¶ 30 The rules of evidence governing admissibility differ as between aggravating and mitigating circumstances. "[I]nformation relevant to any mitigating circumstances . . . may be presented by either the prosecution or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials. . . ." A.R.S. § 13–703(C) (2001). However, "the admissibility of information relevant to any . . . aggravating circumstance . . . shall be governed by the rules of evidence." *Id.*

### A. AGGRAVATING FACTORS

¶ 31 A court cannot impose the death penalty unless it finds that the State has proved at least one aggravating factor under A.R.S. § 13–703(F). *State v. Spreitz,* 190 Ariz. 129, 147, 945 P.2d 1260, 1278 (1997). At trial, the State advanced two: (1) previous conviction of a serious crime, A.R.S. § 13–703(F)(2); and (2) the murder was especially heinous, cruel, or depraved, A.R.S. § 13–703(F)(6). The trial court found each factor beyond a reasonable doubt.

### 1. A.R.S. § 13–703(F)(2): Previous Conviction of a Serious Offense

¶ 32 The legislature amended the (F)(2) aggravating factor, effective April 1993. The date of the crime for which the death sentence was given is the date used to evaluate whether the new version applies. Because the Iler murder occurred in September 1993, the amended version of (F)(2) is applicable. *Kayer,* 194 Ariz. at 433, 984 P.2d at 41 ¶ 30; *State v. Rienhardt,* 190 Ariz. 579,

589, 951 P.2d 454, 464 (1997). Amended § 13–703(F)(2) reads: Aggravation is established where "[t]he defendant was previously convicted of a serious offense, whether preparatory or completed." Second degree murder is a "serious offense." A.R.S. § 13–703(H)(1)(b) (2001).

¶ 33 Defendant was convicted of second degree murder in the killing of Teresa Humphreys. The conviction qualifies under the statute as a previous conviction of a serious offense. The State established at sentencing that the defendant committed second degree murder, and the defendant does not challenge this finding. We therefore hold the (F)(2) aggravating circumstance was established beyond a reasonable doubt.

### 2. A.R.S. § 13–703(F)(6): Especially Heinous, Cruel or Depraved

¶ 34 Section 13–703(F)(6) reads: "The defendant committed the offense in an especially heinous, cruel or depraved manner." To find that a murder fits within this provision, the State must prove that the crime was committed in a manner that places it above the norm for first degree murder. *State v. Gretzler*, 135 Ariz. 42, 53, 659 P.2d 1, 12 (1983). Because the statute is worded in the disjunctive, any one of three elements—heinousness, cruelty, or depravity—is independently sufficient. *State v. Medina*, 193 Ariz. 504, 513, 975 P.2d 94, 103 ¶ 33 (1999).

¶ 35 The State alleged that all three elements of (F)(6) had been established. The trial court did not find especial cruelty because of the absence of defensive wounds or other evidence of consciousness of the victim.

¶ 36 Unlike cruelty, which focuses on the victim's mental suffering and physical pain, heinousness and depravity pertain to the killer's state of mind during and immediately following the murder, as evidenced by his words or conduct. *Medina*, 193 Ariz. at 513, 975 P.2d at 103 ¶ 35. This court has previously defined depraved as "marked by debasement, corruption, perversion or deterioration," and heinous as "hatefully or shockingly evil; grossly bad." *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10 (citing *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977)).

### a. Gratuitous Violence

¶ 37 The trial court concluded both heinousness and depravity were proven beyond a reasonable doubt by evidence of defendant's gratuitous violence. We agree. Maiming a victim beyond the point necessary to fulfill a defendant's criminal purpose, *see State v. Ceja*, 126 Ariz. 35, 40, 612 P.2d 491, 496 (1980), or beyond the point necessary to kill, constitutes gratuitous violence. *Rienhardt*, 190 Ariz. at 590, 951 P.2d at 465. Accordingly, this court has held that bruises to a victim's legs and arms, scraping and cutting injuries to the neck, chest, and breast, a head wound, strangulation, and two deep slashes to the throat demonstrate a defendant's "attempt to inflict unnecessary and gratuitous violence beyond that required to kill" the victim. *State v. Walden*, 183 Ariz. 595, 619, 905 P.2d 974, 998 (1995).

¶ 38 Here, the cause of death was a single, deep knife slash to the victim's throat. Yet, forensic evidence established that defendant also struck the victim on the head several times and delivered enough blows to her chest to fracture the sternum. In addition, petechial hemorrhages in the victim's eyes and a ligature mark around her neck demonstrated an attempt at strangulation prior to her death. Defendant contends that because these injuries occurred prior to death, they evince nothing more than a struggle between the victim and defendant and demonstrate that all such injuries were necessary to kill. This claim, however, is at odds with the physical evidence.

¶ 39 Forensic evidence established that these were not defensive wounds and that a struggle, as claimed by the defendant, was not likely to have occurred. Whether his objective was merely to retrieve money previously paid or actually to take the victim's life, the violence to her body far exceeded that necessary to accomplish either goal. Gratuitous violence was established beyond a reasonable doubt. This finding alone is sufficient to constitute the (F)(6) aggravating circumstance.

### b. Mutilation

¶ 40 Mutilation, also a form of heinousness and depravity, "is an act distinct

from the killing itself that includes the purposeful severing of body parts." *State v. Doerr*, 193 Ariz. 56, 68, 969 P.2d 1168, 1180 ¶ 55 (1998). A finding of mutilation requires some demonstration that the defendant acted with a "separate purpose to mutilate the corpse." *State v. Richmond (III)*, 180 Ariz. 573, 580, 886 P.2d 1329, 1336 (1994). In *Doerr*, this court held that defendant's amputation of part of the victim's left breast and the attempted removal of parts of the right breast established mutilation. 193 Ariz. at 68, 969 P.2d at 1180 ¶ 55.

¶ 41 The defendant here admittedly excised parts of both breasts *after* the death. This constitutes body mutilation. Because he claims these actions were done in anger, the defendant himself separated his motivation to kill from his motivation to mutilate. The evidence is sufficient to prove the (F)(6) factor beyond a reasonable doubt. Moreover, the defendant concedes in the opening brief that his acts of mutilation establish the (F)(6) factor.

## B. MITIGATING FACTORS

¶ 42 The mitigation statute reads in pertinent part:

The court shall consider as mitigating circumstances any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

A.R.S. § 13–703(G)(1) (2001).

¶ 43 We assess both statutory and non-statutory mitigating factors. The former includes significant mental impairment, urged by the defendant. The latter, also urged by the defendant, includes any facet of defendant's character, propensities or record, and any other circumstances of the

offense. The purpose of mitigation evidence is to permit the court to determine whether a sentence less severe than death is appropriate. *See State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Gonzales*, 181 Ariz. 502, 514, 892 P.2d 838, 850 (1995); *State v. Wood*, 180 Ariz. 53, 70, 881 P.2d 1158, 1175 (1994). If evidence of mitigation fails to meet the relevant statutory standard, the court must then consider whether it may constitute non-statutory mitigation. *State v. Gallegos (I)*, 178 Ariz. 1, 22, 870 P.2d 1097, 1118 (1994). Although the court must consider all relevant evidence offered in mitigation, not all proffered evidence must be found by the court to be mitigating, and even if mitigating, such evidence may deserve no more than slight or nominal weight. *State v. Murray*, 184 Ariz. 9, 38, 906 P.2d 542, 571 (1995); *Gonzales*, 181 Ariz. at 515, 892 P.2d at 851 (court required to do no more than consider all evidence offered in mitigation).

¶ 44 The existence of mitigating circumstances is subject to a preponderance of the evidence standard. *State v. Dickens*, 187 Ariz. 1, 24, 926 P.2d 468, 491 (1996); *State v. Laird*, 186 Ariz. 203, 207–08, 920 P.2d 769, 773–74 (1996). The court has discretion to determine how much weight, if any, to give each factor. *State v. Towery*, 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996); *State v. Jones*, 185 Ariz. 471, 489, 917 P.2d 200, 218 (1996).

¶ 45 At sentencing, the trial court concluded that defendant's mitigation evidence failed to outweigh the two aggravating factors associated with Iler's murder. Such evidence was thus not sufficiently substantial to call for leniency, and defendant challenges these findings.

## 1. STATUTORY MITIGATION

### a. Significant Impairment—A.R.S. § 13–703(G)(1)

¶ 46 To qualify for a finding of (G)(1) significant impairment, a defendant must demonstrate that his "capacity to appreciate the wrongfulness of his conduct *or* to conform his conduct to the requirements of law was significantly impaired." *Kayer*, 194 Ariz. at 437, 984 P.2d at 45 ¶ 48 (quoting

A.R.S. § 13–703(G)(1) (emphasis added)). Because this factor is phrased disjunctively, proof of incapacity as to either component will establish mitigation. *Murray*, 184 Ariz. at 40–41, 906 P.2d at 573–74.

¶ 47 A diagnosed mental illness may establish the (G)(1) factor. *See Kayer*, 194 Ariz. at 437, 984 P.2d at 45 ¶ 49.

¶ 48 In determining the existence of (G)(1) mitigation, the trial judge has broad discretion in evaluating the weight and credibility of expert mental health evidence. *Doerr*, 193 Ariz. at 69, 969 P.2d at 1181 ¶ 64; *State v. McKinney (II)*, 185 Ariz. 567, 579, 917 P.2d 1214, 1226 (1996). When mitigation evidence conflicts and entails considerations of credibility, we give substantial deference to the trial court's determinations. *See Hoskins*, 199 Ariz. at 149, 14 P.3d at 1019 ¶ 97 (citing *Milke* at 128, 865 P.2d at 789).

¶ 49 The trial court heard testimony from psychiatric experts for the defendant and the State, as well as from mitigation investigators Mary Duran and Nora Shaw. Defendant's expert, Donald F. Stonefeld, M.D., diagnosed the defendant as suffering from paranoid schizophrenia both prior to and at the time of the killing. He testified that the defendant also suffered from post traumatic stress disorder (PTSD). According to Stonefeld, defendant's Minnesota Multiphasic Personality Inventory (MMPI) test results suggested serious psychopathology with a possible indication of psychotic symptoms and behavior.

¶ 50 Defendant's family has a history of mental health problems. Moreover, he may have had disordered thought processes in early childhood and suffered from lack of judgment and perspective. Stonefeld testified that defendant's mental illness precludes him from normal perceptions of reality. Additionally, at the time of the killing, defendant had used drugs and alcohol that exacerbated his mental deficiency. His drug use began at age eight.

¶ 51 Stonefeld opined that defendant's home environment caused confusion as to his sexuality and sexual identity because his mother frequently switched sexual partners and preferences. Defendant's sexual identity was further confused by several occasions of sexual abuse, both by men and women during childhood. Defendant's history of sexual abuse was corroborated by his brother. Defendant's mother also suffered depression and low self-esteem and exhibited self-absorbed and neglectful behavior patterns toward defendant and his siblings. Defendant claims to have hallucinated during the killing and maintains that his enraged conduct resulted from the fear of either sexual inability or possible homosexuality.

¶ 52 Defendant was first sexually abused between the ages of four and five. At nine or ten years, he was sodomized. Two occasions of sexual molestation during his childhood were perpetrated by adult women. Again at age fifteen, defendant was sodomized several times. All incidents of sexual abuse were perpetrated by strangers or acquaintances, not by family members. By the age of sixteen, defendant supported himself financially by "hustling" on the streets.

¶ 53 Defendant's father was absent and his mother was neglectful, which generated a pattern of thinking by defendant that he could act without consequence. He acted in an unruly manner as a young child and was placed on Ritalin between the ages of five and six for behavioral problems, but he received no further treatment for these difficulties. He attempted suicide several times, including once at age ten. Defendant was placed in special education classes due to his mental health and disabilities.

¶ 54 Stonefeld further opined that the circumstances of the killing demonstrated a lack of control. Defendant perceived his victim as a threat in this sexual situation and, because of his paranoia, believed he was in danger.

¶ 55 Based on this evidence, Stonefeld concluded that defendant's paranoid schizophrenia would have substantially impaired his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. Stonefeld further concluded that symptoms of the impairment had been apparent since childhood.

¶ 56 The trial court also heard testimony from the State's psychological expert, Mi-

chael Brad Bayless, Ph.D., who contradicted Stonefeld's diagnosis and opinions. Bayless opined that "Pandeli was fully aware of his behavior at the time of the offense. He was able to appreciate the wrongfulness of his conduct, and clearly understood the nature and quality of his act." Bayless based this opinion on proof that defendant initially denied involvement in the crime and attempted to eliminate evidence by cleaning his van, washing clothing, and discarding items because he understood the wrongfulness of his actions.

¶ 57 Bayless rejected the diagnosis of paranoid schizophrenia because he disagreed with Stonefeld's interpretation of defendant's MMPI and because, in his opinion, defendant did not meet all of the applicable criteria listed in The American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994), the "bible" of psychological diagnosis. According to Bayless, paranoid schizophrenia is fully incompatible with someone like Pandeli who maintains an active social life and exhibits the ability to interact and make eye contact with others.

¶ 58 Bayless further rejected Stonefeld's diagnosis of PTSD, citing the absence of sufficient indicia. He testified that PTSD is not an "on and off" phenomenon but rather a condition which would grow more prominent if untreated. Bayless testified that he observed no evidence of the disorder. Instead, Bayless indicated that defendant exhibited certain traits of narcissistic and anti-social personality disorder, but Bayless stopped short of diagnosing anti-social personality disorder because defendant failed to exhibit all the appropriate criteria.

¶ 59 The trial court evaluated the competing mental health evidence, as well as all other (G)(1) evidence presented, including the facts of the crime and the defendant's confession. The court stated in its Special Verdict:

> Dr. Bayless, without hesitation and unequivocally, dismissed Dr. Stonefeld's opinion. He said that the Defendant was not a paranoid schizophrenic nor was he suffering from post traumatic stress disorder. In Dr. Bayless' view this Defendant exhib-

its many of the traits of a person who suffers from an antisocial personality disorder—but nothing more.

Special Verdict at 4. Ultimately, the court determined by a preponderance of the evidence that the mental illnesses or disorders, testified to by Stonefeld, did not exist. Additionally, the trial court relied on defendant's attempt to cover up the killing, and his demeanor before and after the crime, in finding that he clearly appreciated the wrongfulness of his conduct.

¶ 60 The trial court's function is to assess the credibility of the expert testimony. See Doerr, 193 Ariz. at 69, 969 P.2d at 1181 ¶ 64. The court's conclusion that defendant does not suffer from a mental illness, but at most, a personality disorder, requires significant deference from this court. See Milke, 177 Ariz. at 128, 865 P.2d at 789. This court has previously held that a defendant's conduct before and after the crime—such as lying about the crime, retrieving belongings before fleeing, and participating in conduct as to avoid capture and prosecution—will support a finding that the defendant was not impaired at the time of the offense. See Jones, 185 Ariz. at 489, 917 P.2d at 218. Upon reviewing the medical and other evidence, we conclude the defendant failed to establish the (G)(1) statutory mitigator.

## 2. NON STATUTORY MITIGATION

### a. Family and Developmental History, Mental/Emotional Health

¶ 61 Following the decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), this court acknowledged that "even if a disorder does not rise to the level of mental disease or defect originally contemplated in (G)(1), the inquiry is not over." State v. Trostle, 191 Ariz. 4, 20, 951 P.2d 869, 885 (1997). The court will continue to assess the evidence to determine whether non-statutory mitigation may be sufficient to warrant a reduction in sentence. Id. (citing State v. McMurtrey, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983)). In addition, the court will determine whether the required causal nexus exists between any mental or personality disorder and the defen-

dant's criminal acts. *Hoskins,* 199 Ariz. at 152, 14 P.3d at 1022 ¶ 111. Our primary task when assessing evidence of mental disorder is to determine its mitigating weight. *Trostle,* 191 Ariz. at 20–21, 951 P.2d at 885–86.

¶ 62 The trial court reconsidered (G)(1) mitigation evidence for non-statutory mitigation and found that though defendant's proven developmental history, family background, and mental and emotional condition might otherwise constitute non-statutory mitigation, such circumstances merited no weight because causation was not established. There was no link between the dysfunction in defendant's life and his crime:

> The Court now determines that the Defendant has proven by a preponderance of the evidence that his family background, his overall developmental history and his mental and/or emotional health through the years to the present as found and described by the Court immediately above are non-statutory mitigating circumstances, though these circumstances are not near [sic] as compelling as represented and argued by the Defendant. Without a doubt, this Defendant had tough and formidable challenges to contend with in his childhood and adolescent years. *In the end, however, when the Court considers these factors separately and collectively, it is unable to make the link from them to the unspeakable criminal conduct in this murder* and they are, therefore, weighed accordingly with any other non-statutory mitigating circumstances against the aggravating circumstances proven beyond a reasonable doubt and already found to exist.

Special Verdict at 7 (emphasis added).

¶ 63 A nexus is established by evidence, testimonial or otherwise, connecting defendant's mental or personality disorder with his crime. *See Trostle,* 191 Ariz. at 19–20, 951 P.2d at 884–85 (psychiatric testimony that "defendant's traumatic upbringing and resulting mental disturbance influenced his criminal actions"). In *Hoskins,* we stated that a nexus finding requires credible expert testimony based on reasoned medical and psychological analysis, that as between the mental disorder or dysfunctional family his-

tory and the actual crime, the former must be a cause of the latter. 199 Ariz. 127, 152 n. 8, 14 P.3d 997, 1022 n. 8.

¶ 64 Here, defendant proffered evidence of several instances of sexual abuse perpetrated by both adult women and men, a neglectful mother, and personality disorders, all of which were accepted as evidence of mitigation by the trial court. Additionally, defendant produced evidence that his own sexual history and identity were wrought with violence and confusion. The trial court accepted this evidence within the umbrella of family and developmental history and mental condition evidence.

¶ 65 Stonefeld opined that defendant's mental disorders affected his actions on the night of the murder. However, Bayless countered both Stonefeld's diagnosis and opinion of causal link, stating unequivocally that the defendant was neither experiencing paranoid delusions, nor was schizophrenia or any other mental disorder a factor which caused this crime to occur. Defendant was in control of his actions and fully understood what he was doing. The trial court accepted Bayless as the more credible expert and concluded that the required nexus, clearly and simply, did not exist between defendant's personality disorder and the crime.

¶ 66 We hold on this record that the defendant failed under the preponderance standard to prove the existence of a causal nexus and, consequently, failed to establish this non-statutory mitigator.

**b. Residual Doubt**

¶ 67 Defendant contends residual doubt exists as to the jury's finding of premeditation and that the trial court erred in refusing to invoke residual doubt as a mitigating factor. We have previously explained our approach to this issue, holding that when a jury verdict "finding defendant guilty beyond a reasonable doubt is supported by very strong evidence, the trial court properly refused to find the nonstatutory mitigating circumstance of residual doubt." *State v. Spears,* 184 Ariz. 277, 295, 908 P.2d 1062, 1080 (1996), *cert. denied,* 519 U.S. 967, 117 S.Ct. 393, 136 L.Ed.2d 308 (2000). The same

is true, even where the verdict is grounded in circumstantial evidence. *See State v. Atwood*, 171 Ariz. 576, 653, 832 P.2d 593, 670 (1992).

¶ 68 Here, relying on his confession, which was properly admitted for sentencing purposes, defendant argues that the victim enraged him by pulling a knife and struggling with him and that he reacted by killing her. Evidence introduced at trial does not support this argument. No forensic evidence reflected a struggle between victim and defendant. No evidence except defendant's confession demonstrated enragement. The victim was beaten and strangled before the killing, affording defendant an opportunity to consider what he was doing. Moreover, this was a repeat crime. Defendant had previously killed another female, also by slitting her throat. His exculpatory claims were not credible, and substantial evidence enabled the jury to find premeditation beyond a reasonable doubt.

¶ 69 We have not heretofore invoked residual doubt as a mitigating circumstance. *See State v. Harrod*, 26 P.3d 492 (2001). Even were we to do so, this record has no evidentiary basis for residual doubt.

### c. Rehabilitation

¶ 70 The potential for rehabilitation during a life sentence may constitute a mitigating circumstance. *See State v. Rossi*, 154 Ariz. 245, 249, 741 P.2d 1223, 1227 (1987). This court has held that the "ability to function well in a structured environment" may constitute mitigation. *Trostle*, 191 Ariz. at 22, 951 P.2d at 887.

¶ 71 Here, the defendant has lived in custody for several years without incident, his MMPI results indicate controlled environments are positive for him, his personality disorders are treatable, he has expressed remorse, he has acquired religious faith, and he has educated himself by learning to read in prison. Indeed, the trial court found that defendant's good behavior as a prisoner, as well as his efforts to learn to read and become a minister, constituted non-statutory mitigation.

¶ 72 His incarceration, however, has been spent in administrative segregation, where he has had fewer opportunities to interact with others. We find that defendant's potential for permanent rehabilitation, even where mitigating, can be accorded only the slightest weight, insufficient, even in concert with other mitigation evidence, to bring about a changed result.

### d. Defendant has Adapted to Incarceration

¶ 73 Good conduct during pretrial and presentence incarceration may be, but is not always, mitigating. *See Spears*, 184 Ariz. at 294, 908 P.2d at 1079; *State v. Stokley*, 182 Ariz. 505, 524, 898 P.2d 454, 473 (1995). Defendant presented evidence at the sentencing hearing that he has been a model prisoner. He has not been involved in difficulties or altercations while in prison and has adjusted to his incarceration. This evidence was found to be minimally mitigating. We agree.

### e. Educational Advancements Since Incarceration

¶ 74 Evidence of educational achievement has been considered nominally mitigating. *See State v. Hensley*, 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984). Uncontradicted evidence at the sentencing hearing established that defendant taught himself to read and write while incarcerated. These advancements are entitled only to minimal mitigation.

### f. Poor Health

¶ 75 We have held that a defendant's post-incarceration illness is not relevant to the question of leniency. *State v. Spencer*, 176 Ariz. 36, 45, 859 P.2d 146, 155 (1993). The defendant offered mitigating evidence that he contracted hepatitis C, which will shorten his life, and the trial court found that defendant established this fact by a preponderance of the evidence. However, it found the illness to be minimally mitigating. We disagree. The evidence is not mitigating.

### g. Timing of Prior Murder and Circumstances of Present Offense

¶ 76 Defendant claims that the timing of the Humphreys killing and the circumstances of the present killing should be considered mitigating. However, little argument is presented on the "timing" factor, and the argument, such as it is, is unclear. We assume defendant is referring to the fact the Humphreys murder occurred more than a year earlier. We accord this fact no weight in mitigation.

### h. Cooperation with Law Enforcement Personnel

¶ 77 Admission of guilt and cooperation with the police can be a mitigating circumstance. *State v. Miller,* 186 Ariz. 314, 326, 921 P.2d 1151, 1163 (1996). Defendant requests that his cooperation with the police and his confession be considered mitigating. However, defendant did not cooperate with police, evidenced by the fact that he sought to hide or destroy evidence, evade detection, and initially denied knowledge of the crime. Only when he believed his guilt was discoverable through forensic testing did he attempt to help himself by confessing. This form of cooperation will not serve as mitigation.

### i. Genuine Remorse

¶ 78 Genuine remorse may constitute non-statutory mitigation. *State v. Gallegos (II),* 185 Ariz. 340, 345–46, 916 P.2d 1056, 1061–62 (1996) (defendant eventually cooperated with police and expressed remorse at the sentencing hearing); *Atwood,* 171 Ariz. at 653, 832 P.2d at 670. The defendant expressed remorse over the killings of both Humphreys and Iler and expressed regret over the pain brought upon their families. The trial court found defendant's remorse genuine and mitigating. His expressions of remorse during the confession and at sentencing appear authentic. We conclude defendant established remorse as a mitigator by a preponderance of the evidence.

### j. Religious Faith

¶ 79 New-found religious faith may be considered non-statutory mitigation. *See State v. Serna,* 163 Ariz. 260, 269, 787 P.2d 1056, 1065 (1990) (defendant found religion in prison and ministered to other inmates); *State v. Gillies (II),* 142 Ariz. 564, 571, 691 P.2d 655, 662 (1984) (becoming religious, showing remorse, and being a placid prisoner was mitigating). Defendant sought religious affiliation while incarcerated. We find this form of religious faith, found after conviction and incarceration, entitled only to slight mitigating weight.

### k. Overall Good Prior Character

¶ 80 Evidence of no prior crimes may be mitigating. *Stokley,* 182 Ariz. at 523, 898 P.2d at 472 (lack of prior felony convictions may constitute non-statutory mitigation). Evidence of general good character may be mitigating. *See State v. Williams,* 183 Ariz. 368, 384, 904 P.2d 437, 453 (1995). Prior to the two murders, defendant had no trouble with the law. However, in light of the two murders committed just over one year apart, any argument of overall good character must be rejected.

## C. WEIGHING CIRCUMSTANCES

¶ 81 Aggravating and mitigating circumstances are evaluated both separately and cumulatively. *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994). When at least one aggravator is found and one or more mitigators is established, this court must decide whether the mitigation is sufficiently substantial to call for a reduction in sentence. *State v. Zaragoza,* 135 Ariz. 63, 70, 659 P.2d 22, 29 (1983).

¶ 82 The trial court found A.R.S. §§ 13–703(F)(2) (prior conviction of serious crime) and (F)(6) (heinous, cruel or depraved) aggravation beyond a reasonable doubt and concluded that the mitigating circumstances, viewed separately or together, were insufficient to call for leniency. "This was a savagely cruel, coldblooded, and very brutal first degree murder that, when considered with the fact that the Defendant murdered the victim in Count I by also slitting her throat, warrants the severest sanction." Special Verdict at 9.

¶ 83 After thorough review, we conclude that all mitigating factors, viewed separately or cumulatively, fail to provide sufficient reason to call for leniency in light of the prior murder of Humphreys, as well as the brutal circumstances of the Iler murder and the subsequent mutilation of her body.

## III. ISSUES RAISED TO PREVENT PRECLUSION

¶ 84 Defendant makes additional arguments to prevent preclusion. None of the arguments will assist him. This court has previously considered and rejected each.

¶ 85 1. The Arizona death sentencing procedure is unconstitutional because it denies the right to trial by jury on all sentencing issues. See Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); but see State v. Ring, 200 Ariz. 267, 278–279, 25 P.3d 1139, 1150–1151, ¶¶ 40–44 (2001), regarding the issue raised under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and related cases.

¶ 86 2. Arizona's sentencing procedure requires proof of mitigating circumstances by a preponderance of the evidence, which improperly precludes the sentencing court from considering some mitigating evidence. White, 194 Ariz. at 355, 982 P.2d at 830 ¶ 49 (statutory requirement of proving mitigation by preponderance of the evidence does not obviate consideration of all mitigating facts).

¶ 87 3. The sentencing statute is facially invalid as irrational and as cruel and unusual punishment. State v. West, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993) (Arizona death statute not cruel and unusual on its face).

¶ 88 4. The sentencing statute violates defendant's right to individualized punishment by requiring imposition of death when one aggravating circumstance is found with no mitigating factors. See Bolton, 182 Ariz. at 310, 896 P.2d at 850.

¶ 89 5. The sentencing statute fails to provide defendant with an opportunity to death qualify the sentencing judge. See Gulbrandson, 184 Ariz. at 72, 906 P.2d at 605.

¶ 90 6. The sentencing statute fails to provide objective standards to guide the sentencing court in weighing aggravating and mitigating circumstances, places the burden of proof of mitigation impermissibly on the defendant, fails to channel the sentencing discretion of the court by failing to narrow the class of persons eligible for the death penalty, and fails to require the State to prove that a death sentence is appropriate. White, 194 Ariz. at 355, 982 P.2d at 830 ¶ 49.

¶ 91 7. The statute violates due process of law by not requiring a proportionality review. See State v. Salazar, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992) (proportionality review not constitutionally required).

¶ 92 8. The statute fails to require the sentencing court to find beyond a reasonable doubt that aggravating circumstances outweigh the accumulated mitigating circumstances. Stokley, 182 Ariz. at 516, 898 P.2d at 465.

¶ 93 9. The statute fails to provide a procedure by which to evaluate the impartiality of the sentencing judge. White, 194 Ariz. at 356, 982 P.2d at 831 ¶ 49 (no provision necessary for voir dire examination of the sentencing court).

## CONCLUSION

¶ 94 Defendant's conviction of first degree murder is founded on substantial evidence. The State proved two aggravating circumstances beyond a reasonable doubt: (F)(2), the defendant committed a prior serious offense, and (F)(6), this murder was especially heinous, cruel or depraved. Defendant failed to prove the existence of the (G)(1) statutory mitigating circumstance. Though defendant proved that his family and developmental history presented great difficulty and that he suffers mental and emotional difficulties, he failed to establish the requisite causal nexus between these circumstances and the Iler murder. He did establish that he has been a good prisoner, has made educational progress since incarceration, possesses genuine remorse, and has gained religious faith. We have considered and weighed all mitigating factors separately and cumulatively. That analysis leads us to conclude that the mitigation is insufficient to reduce the sentence. We therefore affirm both the conviction of

first degree murder and the capital sentence imposed by the trial court.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, STANLEY G. FELDMAN, Justice FREDERICK J. MARTONE, Justice, RUTH V. McGREGOR, Justice.