IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**STATE OF ARIZONA,**
*Plaintiff/Petitioner,*

*V.*

**DARREL PETER PANDELI,**
*Defendant/Respondent.*

———————

No. CR-15-0270-PC
Filed May 15, 2017

———————

On Review from the Superior Court in Maricopa County
The Honorable Robert L. Gottsfield, Judge
No. CR1993-008116
**REVERSED**

———————

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Lacy Stover Gard (argued), Chief Counsel, Capital Litigation Section, Jason Easterday, Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Kenneth S. Countryman, Kenneth S. Countryman, P.C., Tempe; and Julie S. Hall (argued), Oracle, Attorneys for Darrel Peter Pandeli

Amy P. Knight, Kuykendall & Associates, Tucson; Amy M. Kalman, Maricopa County Public Defender's Office, Phoenix; David J. Euchner (argued), Pima County Public Defender's Office, Tucson; and Amy S. Armstrong, Tucson, Attorneys for Amici Curiae Arizona Attorneys for Criminal Justice and Arizona Capital Representation Project

———————

JUSTICE BOLICK authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL and TIMMER joined.

———————

JUSTICE BOLICK, opinion of the Court:

## BACKGROUND

**¶1**         Darrel Pandeli was sentenced to death in 1998 for the murder of Holly Iler.  This Court affirmed the conviction and death sentence.  *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 382–83 ¶ 94, 26 P.3d 1136, 1153–54 (2001).  However, the United States Supreme Court vacated the judgment and remanded the case for further consideration in light of *Ring v. Arizona*, 536 U.S. 584 (2002).  *Pandeli v. Arizona* (*Pandeli II*), 536 U.S. 953 (2002) (mem.).  This Court vacated the death sentence and remanded to the trial court for a new sentencing hearing.  *State v. Pandeli* (*Pandeli III*), 204 Ariz. 569, 572 ¶ 11, 65 P.3d 950, 953 (2003).  On remand, the jury found that Pandeli should be put to death.  This Court affirmed.  *State v. Pandeli* (*Pandeli IV*), 215 Ariz. 514, 533 ¶ 85, 161 P.3d 557, 576 (2007).

**¶2**         In July 2011, Pandeli's post-conviction relief ("PCR") attorney filed a petition alleging multiple trial court errors, prosecutorial abuses, and fifteen claims of ineffective assistance of counsel ("IAC").  In September 2012, the PCR court largely denied the petition but set an evidentiary hearing on the IAC claims.  The PCR court subsequently granted relief on all those claims as well as an additional due process violation, setting aside Pandeli's death sentence, and ordering a new aggravation and penalty phase sentencing trial.  The State sought review from this Court.  We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-755 and 13-4031.  For the reasons set forth below, we reverse.

## DISCUSSION

**¶3**  We examine a PCR court's findings of fact to determine if they are clearly erroneous. *State v. Cuffle*, 171 Ariz. 49, 51, 828 P.2d 773, 775 (1992). Arizona Rule of Criminal Procedure 32.8(d) requires a court to "make specific findings of fact, and . . . state expressly its conclusions of law relating to each issue presented." *See State v. Tankersley*, 211 Ariz. 323, 324, 121 P.3d 829, 830 (2005). Unfortunately, the PCR court made few specific findings and failed to connect them to its conclusions on many of the issues presented. The court failed to make findings for some claims at all. Most problematic, the PCR court did not explain how Pandeli suffered prejudice from any of the acts or omissions it deemed to constitute IAC or to violate due process. *Cf. Strickland v. Washington*, 466 U.S. 668, 687 (1984) (recognizing prejudice as an element for an IAC claim). As a result, our ordinary deference to the PCR court's factual findings is largely inapplicable here. Instead, we have reviewed the record and conclude that Pandeli did not establish IAC or prove his due process claim.

### A. IAC Claims

**¶4**  Whether Pandeli's lawyers "rendered ineffective assistance is a mixed question of fact and law." *State v. Denz*, 232 Ariz. 441, 444 ¶ 6, 306 P.3d 98, 101 (App. 2013). We review the court's legal conclusions and constitutional issues de novo. *Id.*; *see also State v. Newell*, 212 Ariz. 389, 397 ¶ 27, 132 P.3d 833, 841 (2006). However, we ultimately review a PCR court's ruling on a petition for post-conviction relief for an abuse of discretion. *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986). An abuse of discretion occurs if the PCR court makes an error of law or fails to adequately investigate the facts necessary to support its decision. *State v. Wall*, 212 Ariz. 1, 3 ¶ 12, 126 P.3d 148, 150 (2006); *State v. Douglas*, 87 Ariz. 182, 187, 349 P.2d 622, 625 (1960).

**¶5**  The State contends the PCR court erred in granting relief on Pandeli's IAC claims because it did not properly apply the highly deferential standards for reviewing such claims under the two-pronged test set forth in *Strickland*, 466 U.S. at 687. "Under *Strickland*, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (quoting

*Padilla v. Kentucky*, 559 U.S. 356, 366 (2010)).  This inquiry focuses on the "practice and expectations of the legal community," and asks, in light of all the circumstances, whether counsel's performance was reasonable under prevailing professional norms.  *Id.*

**¶6**　　　　Next, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 1089 (quoting *Strickland*, 466 U.S. at 694).  But "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," because then "[v]irtually every act or omission of counsel would meet that test."  *Strickland*, 466 U.S. at 693.  Although a defendant must satisfy both prongs of the *Strickland* test, this Court is not required to address both prongs "if the defendant makes an insufficient showing on one."  *Id.* at 697.

**¶7**　　　　Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (citation and internal quotation marks omitted).  A defendant does so by showing that his counsel's performance fell outside the acceptable "range of competence," and did not meet "an objective standard of reasonableness."  *Id.* at 687–88.  In short, reviewing courts must be very cautious in deeming trial counsel's assistance ineffective when counsel's challenged acts or omissions might have a reasonable explanation.

**¶8**　　　　The PCR court did not apply this deferential standard of review, instead repeatedly second-guessing counsel's strategy decisions. Simply disagreeing with strategy decisions cannot support a determination that representation was inadequate.  *Id.* at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").  We proceed to assess each of the PCR court's findings of inadequate assistance in turn.

### 1. Failure to cross-examine Dr. Bayless

**¶9**        Many of the PCR court's findings pertain to the fact that Pandeli's counsel did not cross-examine the State's key witness, Dr. Brad Bayless, a psychologist, during the penalty phase.  Pandeli argued five general types of mitigation: he was physically and sexually abused as a child, began abusing drugs and alcohol at an early age, suffered from a cognitive disorder, behaved well while in prison, and could maintain positive relationships. *Pandeli IV*, 215 Ariz. at 531–33 ¶¶ 70–83, 161 P.3d at 574–76.  In rebuttal, the State called Dr. Bayless to testify about Pandeli's mental health and other characteristics.  Defense counsel did not cross-examine Dr. Bayless.  The PCR court observed,

> Dr. Bayless is a state's witness who routinely testified for the state in death penalty cases.  In most cases, Dr. Bayless testifies that a defendant is psychotic and that there's no saving him.  Dr. Bayless frequently doesn't have any scientific basis for his opinion.  He used projective tests that are subjective and should not be used in a death penalty case.  His testing was not appropriate and misleading.

In this vein, the PCR court engaged in second-guessing defense counsel's strategic decision to forgo cross-examination of Dr. Bayless and rebut his testimony with their own expert. *Cf. Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").  Moreover, the court made sweeping generalizations unmoored to specific findings of IAC.

**¶10**        The PCR court further found, based on the testimony of attorney Michael Reeves, Pandelli's professional standards expert, that defense counsel "should have cross-examined Dr. Bayless or somehow dealt with the information and testimony he presented.  [Defense counsel] did not counteract any information presented by Dr. Bayless."

**¶11**        Pandeli's lead counsel, Gary Shriver, acknowledged that the failure to cross-examine Dr. Bayless was a spur-of-the-moment decision

resulting from "wrongheadedness."[1]  Co-counsel Dawn Sinclair testified that they were not fully prepared to deal with Dr. Bayless because they did not know what questions to ask about his report.  Thus, the court found that Pandeli's attorneys were unprepared to interview or cross-examine Dr. Bayless or challenge the unsupportable conclusions he made.  The court further found that "both attorneys agreed that the decision [not to cross-examine Dr. Bayless] was not strategic and [was] a failure of counsel to adequately defend [Pandeli]."

¶12         Considering the entire record, however, we conclude that Pandeli failed to prove IAC, and the PCR court erred by finding otherwise. Although the decision not to interview Dr. Bayless was "made on the fly," it was an informed and defensible one made on the basis of extensive investigation and preparation.  At the PCR hearing, Shriver testified that he had "known Dr. Bayless since [he] started practicing," and he believed that as an adversary witness, Dr. Bayless was "hard to control."  He also believed that Dr. Bayless "was known to sandbag and bring out more . . . harmful stuff during a defense cross."  Shriver also found that when Dr. Bayless would testify before a jury "there was a performance" and "[i]t wasn't simply providing testimony as an expert," but rather Dr. Bayless was "wait[ing] [to] bring even more, bring the real guns out in cross." Therefore, Shriver believed "that simply cross-examining [Dr. Bayless] before a jury is not necessarily the key.  It doesn't mean that you are going to successfully examine him at least in my opinion."

¶13         Shriver explained "what was on [his] mind" when he decided to forgo cross-examination, namely that he could prevent Dr. Bayless from further harming Pandeli's case on cross-examination, as he was known to do.  Shriver believed that Dr. Bayless's direct examination was not nearly as harmful as the defense anticipated.  Thus, Shriver was worried that Dr. Bayless would use cross-examination as an opportunity to "thrust and parry to get his points across."  Finally, by declining cross-examination, Shriver would deprive the State of an opportunity for redirect.

---

[1] Neither Gary Shriver nor his co-counsel, Dawn Sinclair, represented Pandeli at his first trial.  Dr. Bayless testified during the penalty phases at both of Pandeli's trials.

¶14　　　　The record fails to show defense counsel was unprepared to cross-examine Dr. Bayless.  To prepare for the resentencing trial, Shriver compiled transcripts of Dr. Bayless's testimony from other cases, discussed with other defense attorneys how to deal with Dr. Bayless, and interviewed him several times over three days.  Shriver testified that he and Sinclair prepared an outline and were prepared to cross-examine Dr. Bayless when trial started.  He also believed that he had somewhat impeached Dr. Bayless's findings through the testimony of Pandeli's expert, Dr. Mark Cunningham.  Therefore, Shriver and Sinclair, after a brief discussion, chose to forgo cross-examination to prevent Dr. Bayless from further damaging Pandeli's case.  Based on their research and experience with Dr. Bayless, counsel reasonably concluded that a cross-examination would give the expert a chance to inflict greater damage than he had on direct.  *See State v. Farni*, 112 Ariz. 132, 133, 539 P.2d 889, 890 (1975) ("The failure of defense counsel to cross-examine one witness and question others on certain points was also a tactical decision and is not evidence of incompetence.").

¶15　　　　The PCR court erred by substituting its after-the-fact judgment for counsel's during trial.  "Disagreements as to trial strategy or errors in trial will not support a claim of ineffective assistance of counsel as long as the challenged conduct could have some reasoned basis."  *State v. Meeker*, 143 Ariz. 256, 260, 693 P.2d 911, 915 (1984).  Counsel clearly had, at a minimum, "some reasoned basis," *State v. Nirschel*, 155 Ariz. 206, 209, 745 P.2d 953, 956 (1987), for forgoing cross-examination of Dr. Bayless.  Thus, the PCR court overlooked evidence that the decision not to cross-examine Dr. Bayless was the product of a reasoned (even if mistaken) strategic judgment.  *See Strickland*, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

¶16　　　　Moreover, counsel did not leave Dr. Bayless's testimony completely uncontested, but rather used their own defense experts to rebut significant portions of his testimony.  *Contra United States v. Cronic*, 466 U.S. 648, 659 (1984) ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.").  Although defense counsel, in hindsight, may have "dropped the ball" by not calling Dr. Cunningham back to the stand to reinforce his

earlier testimony that contradicted Dr. Bayless, that mistake did not constitute IAC given the fact that counsel did impeach much of Dr. Bayless's testimony through other witnesses.

¶17 For example, as Shriver testified, counsel laid the groundwork to impeach Dr. Bayless through Dr. Cunningham by:

> [Setting] the table to show that a lot of these concepts that Bayless would testify in the State's case were not sound, under sound psychology.
>
> Now, I didn't feel that I had completely done away with any harm from Bayless' testimony by asking Dr. Cunningham certain questions, but I felt we had at least provided a basis for the jury to understand that Bayless should not be given as much credibility as he would have liked or the State would have liked.

Although counsel did not fully impeach Dr. Bayless's testimony through Dr. Cunningham, he strategically elicited information that put the jury on notice that Dr. Bayless's methods and testimony might not be accurate.

¶18 Defense counsel anticipated that Dr. Bayless would testify that Pandeli malingered during his psychological tests. Therefore, counsel attempted to preemptively combat that testimony by having Dr. Marc Walter testify that he believed Pandeli was "putting forward good effort" in the tests. Dr. Walter also testified that he disagreed with Dr. Bayless's diagnosis that Pandeli had a mild learning disability, stating that Pandeli had a "very serious learning disability" and did not think things through "because of the frontal lobe dysfunction."

¶19 Dr. Bayless's use of projective tests was called into question at the PCR hearing by several witnesses. Michael Reeves, Dr. Weinstein (a psychologist specializing in clinical and forensic neuropsychology), and Dr. Jones (a forensic psychologist) all criticized Dr. Bayless's use of projective tests because they do not have standardized scores. At trial, Dr. Cheryl Karp also testified that some of the tests are not appropriate to "generate . . . a diagnosis," which served to impeach Dr. Bayless's findings.

¶20 Finally, Dr. Bayless's determination that Pandeli has antisocial personality disorder was called into question at trial. Counsel elicited testimony from Dr. Cunningham that Pandeli "[p]otentially . . . would meet the adult criteria for anti-social personality disorder," but that diagnosis was "irrelevant" for sentencing determination because it did not inform "how [Pandeli] came to be damaged." In closing, counsel reiterated this point, telling the jury that "[t]he State and Dr. Bayless missed the point entirely. . . . That [Pandeli] has antisocial personality disorder doesn't rebut a single thing that the defense had put on. . . . [T]hat diagnosis tells you nothing with respect to this sentencing proceeding."

¶21 The decision to use other expert testimony to attempt to preemptively impeach parts of Dr. Bayless's testimony and then forgo cross-examination was a strategic decision that defendant has not demonstrated falls below the level expected of a reasonably competent defense attorney. *Cf. State v. Goswick*, 142 Ariz. 582, 586, 691 P.2d 673, 677 (1984) (no IAC if counsel's decision had a reasoned basis rather than the result of "ineptitude, inexperience, or lack of preparation"). No finding was made that the decision lacked "some reasoned basis," and the evidence would not support such a finding.

## 2. Failure to obtain brain imaging scans

¶22 The PCR court found that defense counsel's failure to present medical documentation of brain injury and brain dysfunction constituted IAC. After the PCR hearing, the court found that "[o]bjective testing would have shown that [Pandeli] had frontal lobe impairment and it was causally connected to his childhood and development issues."

¶23 Pandeli argues that no strategic reason existed to forgo a brain scan to document Pandeli's brain damage, especially a quantitative electroencephalogram ("QEEG") scan. The State argues that counsel called two experts who testified that Pandeli had a brain injury, and did not need to present additional and cumulative evidence of brain injury. We conclude the decision not to present further documentation of brain injury and dysfunction was a strategic choice and did not constitute IAC.

¶24 Defense counsel hired Dr. Walter to perform a neuropsychological evaluation of Pandeli, which included reviewing

medical records, interviewing Pandeli, and giving him psychological and neuropsychological tests. Dr. Walter testified at trial that Pandeli's frontal lobe was impaired. Dr. Walter did not use any documented brain scans in his testing, such as magnetic resonance imaging ("MRI"), computerized tomography ("CT scan"), positron emission tomography ("PET scan"), or QEEG to make his diagnosis. He testified that he did not recommend these types of brain scans because "there's not necessarily a good correlation between these tests and actually . . . what a person's cognitive abilities are. So . . . there is controversy about whether . . . they are helpful in terms of forensic cases like this one." Dr. Walter also testified that these scans could produce "false positives and false negatives," so he must administer the same neuropsychological tests despite whatever results come from a brain scan. Dr. Cunningham agreed at trial, reiterating that brain scans can produce false positives and negatives, and that the findings from the neuropsychological tests that were administered could "stand on their own."

¶25        At the PCR hearing, Dr. Weinstein testified that Dr. Walter was a "very qualified neuropsychologist" and used the right neuropsychological tests to evaluate Pandeli. He testified that brain scans were unnecessary because frontal lobe impairment can be diagnosed solely on neuropsychological testing, and confirmed that Dr. Walter had performed such testing. He also stated that very few psychologists used QEEG scans in their practice in 2006 and that the scan was not required to diagnose frontal lobe impairment and was not a substitute for a neuropsychological evaluation.

¶26        Given this record, the decision to forgo brain scans was a reasoned, strategic decision by Pandeli's counsel and does not establish IAC.

### 3.  Failure to present sufficient mitigation and develop a nexus

¶27        The PCR court found that defense counsel's "failure to conduct a thorough investigation of the defendant's background and present sufficient mitigating evidence in an attempt to establish a nexus between the mitigation and the crime" constituted another instance of IAC. The court found that trial counsel "failed to have psychological or

neuropsychological evaluations done" and "failed to hire a psychologist or neuropsychologist to explore the various different aspects of how Mr. Pandeli's childhood was destructive of his entire personality." It also found that counsel were ineffective because they failed to establish a causal relationship "between brain impairment and the death penalty" and "failed to develop a nexus between the psychologist's reports and Mr. Pandeli's crimes." Finally, it concluded that counsel "did an insufficient investigation into [Pandeli's] background, to understand how it related to the offense," which "fell short of prevailing professional norms." Thus, the court determined that "comparing the totality of the evidence that actually was presented to the jury with the totality of the evidence that might have been presented had counsel acted differently, makes it highly probable that the outcome of the proceedings might have been different."

¶28 The record does not support the court's finding. Counsel testified that they were aware that the United States Supreme Court held in *Tennard v. Dretke*, 542 U.S. 274 (2004), that establishing a causal nexus between the mitigating evidence and the crime is not required, but that they believed the jury and this Court would give the mitigation evidence more weight if a nexus was established. *See State v. Roseberry*, 237 Ariz. 507, 509 ¶ 12, 353 P.3d 847, 849 (2015) ("[A]ll mitigation evidence must be considered and . . . its causal relationship to the crime goes to the weight to be given to the evidence."). Therefore, they attempted to prove a causal nexus by having a neuropsychological evaluation performed by Dr. Walter and a psychological evaluation performed by Dr. Cunningham, and both doctors testified at trial how Pandeli's upbringing negatively affected his personality and behavior as an adult. The three mental health experts called by the defense each testified about the causal nexus between Pandeli's traumatic childhood and mental impairment and the murder he committed. Additionally, in closing, counsel argued that Pandeli's childhood and mental impairments contributed to Iler's murder.

¶29 This Court acknowledged that Pandeli:

> attempted to tie his mental impairment to the crime. Dr. Walter testified that frontal lobe impairment makes a person act impulsively, can cause violence, and could have led to the

murder of Iler. Similarly, Dr. Cunningham testified that the murders of both Humphreys and Iler were disorganized, demonstrating that Pandeli's impairment may have played a role in them.

*Pandeli IV*, 215 Ariz. at 533 ¶ 79, 161 P.3d at 576.

**¶30** Pandeli has not identified any relevant aspect of his background left uninvestigated or unpresented. The testimony provided by Dr. Weinstein and Dr. Jones at the PCR hearing closely paralleled the testimony given by Dr. Cunningham and Dr. Walter at trial. Both sets of experts concluded that Pandeli's childhood trauma and neurological impairments explained his criminal conduct. Although no additional or new investigation was conducted into Pandeli's background, Dr. Weinstein and Dr. Jones interviewed Pandeli and relied on the records compiled by defense counsel for the 2006 resentencing proceeding. While there were minor differences in the testimony given by the experts at trial and the PCR hearing, the trial experts merely used different methodology to reach the same conclusions as the PCR experts. Thus, the PCR court's findings related to the issue of failure to investigate mitigation evidence properly are also clearly wrong. Ultimately, Pandeli did not meet his burden of proof that counsel was deficient with regard to this issue.

### 4. Failure to object to other act evidence

**¶31** The PCR court found IAC because counsel failed to challenge the State's rebuttal evidence during the penalty phase of the trial, specifically evidence that Pandeli's former girlfriend, L.R., alleged he had molested her daughter. This was an informed, strategic decision that did not constitute IAC.

**¶32** When L.R. was unavailable to testify at resentencing, the State read L.R.'s interview statements to the jury during rebuttal. The court granted defense counsel's motion to exclude L.R.'s statements regarding other persons' allegations of Pandeli's prior bad acts that she had heard about. However, counsel did not object to the State admitting L.R.'s statement about what Pandeli did to her daughter.

**¶33** At the PCR hearing, Shriver explained that he originally tried to limit the State's rebuttal evidence during the penalty phase to only the evidence that rebutted the mitigation evidence he planned to provide. However, the trial court ruled that based on A.R.S. § 13-751(C), the State could present any relevant and reliable hearsay as rebuttal evidence, even if unrelated to the mitigation evidence. Shriver testified at the PCR hearing that this put them "on notice . . . that a lot of this stuff is coming in." With that in mind, counsel believed that "since the jury is going to hear [evidence of Pandeli's other acts,] . . . [counsel] attempted to show . . . that's not that unusual given the circumstances of Mr. Pandeli's upbringing." Therefore, counsel attempted to show that the alleged molestation was a product of damage that Pandeli sustained early in his childhood. Given the trial court's ruling on relevant and reliable hearsay, it is understandable that counsel accepted admission of L.R.'s statements and attempted to use them to bolster his mitigation evidence. *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.").

### 5. Failure to challenge aggravating factors

**¶34** The PCR court did not make specific findings of fact on the prior homicide and the heinous and depraved aggravators, but found that counsel "failed to challenge the aggravators offered by the state. This includes aggravators in regard to infliction of gratuitous violence, senselessness of the crime and the helplessness of the victim." *See State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983) (relishing of the murder, infliction of gratuitous violence, mutilation of victim, senselessness of the crime, and helplessness of victim are factors in evaluating heinous and depraved aggravator). At resentencing, the State sought to prove the (F)(2) aggravator—that Pandeli had been "previously convicted of a serious offense"—by introducing evidence of his 1996 conviction for the second-degree murder of Teresa Humphreys in 1992. *See Pandeli I*, 200 Ariz. at 370 ¶¶ 2–3, 375 ¶ 33, 26 P.3d at 1141, 1146. The State also sought to prove the (F)(6) aggravator—that Pandeli committed the murder of Iler "in an especially heinous, cruel or depraved manner"—by introducing evidence that Pandeli mutilated her body and kept souvenirs from the murder. The jury found that the State proved both aggravating factors, as did this Court

on independent review. *Pandeli IV*, 215 Ariz. at 531 ¶ 69, 161 P.3d at 574.

**¶35**         Defense counsel moved to dismiss both the (F)(2) and (F)(6) aggravators in pretrial motions. Counsel testified at the PCR hearing that, after the motions were denied, they decided not to challenge the aggravators in order to maintain credibility with the jury. Counsel testified that "[i]t was dead certain" that the State was going to be able to prove the (F)(2) aggravator pertaining to a prior serious offense because Pandeli had already been convicted of second-degree murder of Humphreys. Counsel also testified that regardless how they attempted to challenge the (F)(6) aggravator, it would be clear that Iler's nipples had been removed. Thus, counsel continued, if they

> were to somehow try to argue that . . . if it wasn't done as mutilation, which would be . . . post-death[,] then they would have been done while the woman was still alive, which would have then likely gotten into the gratuitous violence situation, so the way we analyzed it is if we were going to lose on that no matter what we did, . . . to spend a lot of time having [the jury] parse whether or not this person was . . . depraved loses something.

**¶36**         Thus, counsel determined that "fighting . . . to fight the fight was to me not a wise thing" because he would have "lost credibility" in the eyes of the jurors if he had futilely challenged the (F)(6) aggravator. Given this record, Pandeli did not prove deficient performance by counsel.

### 6. Failure to object to rebuttal evidence

**¶37**         The PCR court found that counsel's "failure to object to [the] state's presentation of violent sex and fantasies as acknowledged by the Supreme Court," constituted IAC. However, the PCR court failed to make specific findings on this claim in its final ruling, as required by Rule 32.8(d). Regardless, the record does not support a finding of IAC.

**¶38**         During the penalty phase rebuttal, the State read interview

statements from L.R. to the jury about Pandeli's violent sexual fantasies, including his fantasy of killing a man who had abused him. Another former girlfriend testified that, on two separate occasions, Pandeli sexually assaulted her when he tied her up and pressed the "flat edge" of a knife against her throat. On appeal, this Court concluded that admission of this evidence did not constitute fundamental error. *Pandeli IV*, 215 Ariz. at 528 ¶ 47, 161 P.3d at 571.

¶39 At the PCR hearing, Shriver testified that, at the time, he believed the testimony was admissible because of the trial court's ruling that the State was permitted to introduce any relevant and reliable hearsay evidence to demonstrate why Pandeli should not be shown leniency. Nevertheless, he moved the court to limit the content of this evidence. Shriver testified that the court denied his motion so he was "forced then to work that into our theory," and that the defense prepared for and cross-examined the former girlfriend on her testimony.

¶40 The court also found that defense counsel's failure "to object to [the] state's rebuttal evidence of violent sex, or to defendant's fantasies of murder, opened the door to testimony of the prior murder and the photos of the Humphreys murder." But counsel repeatedly filed motions to preclude or limit the testimony that the State sought to introduce. However, the State was permitted to introduce evidence that Humphreys' body was found on a sidewalk, the scene indicated that she had been killed there, her body had multiple stab wounds, she had cuts to her throat and defensive wounds on her hands, and she had died of a stab wound to the chest. On appeal, we held that the trial court did not abuse its discretion by admitting this evidence because it was relevant and not unduly prejudicial. *Pandeli IV*, 215 Ariz. at 528–29 ¶¶ 52–53, 161 Ariz. at 571–72.

¶41 At the PCR hearing, Shriver testified that he believed, under the existing case law, that the facts and evidence of Humphreys' murder would be admitted as relevant to leniency and his experts would be questioned about it. He also testified he believed that the Humphreys murder was "an integral part of [Pandeli's] troubled life" and it was "part and parcel of his mitigation" to show that it was no surprise that he killed another woman but should nonetheless be shown leniency.

¶42 On this record, Pandeli has failed to meet his burden of proof that counsel's performance was deficient. Counsel's testimony at the PCR hearing established that counsel attempted to preclude the evidence, and when that failed, prepared their witnesses to be cross-examined on the facts and attempted to fit the evidence into the overall mitigation presentation. Counsel's actions were the product of strategic decisions given the trial court's ruling and did not constitute IAC. The PCR court abused its discretion in granting relief on this claim.

### 7. Failure to object to references to serial killers

¶43 The PCR court found that defense counsel's "failure to object to reference of serial killers" constituted IAC. However, the PCR court made no specific findings on this claim in its final ruling, in violation of Rule 32.8(d). The record demonstrates that Pandeli did not meet his burden of proving IAC.

¶44 Pandeli argued in his PCR petition that the State "repeatedly asked questions about serial killers from material relied upon by Dr. Cunningham" and that "[m]ost of those questions had no bearing on this case." Pandeli claims that counsel were ineffective because they "did not object to the questions until well after [the State] had already asked those questions and placed in the jurors['] mind that [Pandeli] was a serial killer."

¶45 At the penalty phase retrial, the subject of serial killers was mentioned in a publication that Dr. Cunningham relied on. As Pandeli acknowledges, defense counsel raised multiple objections to the prosecutor's general line of questioning that referenced the publication and unsuccessfully requested a mistrial on that basis. The record thus demonstrates that counsel vigorously contested the evidence.

### 8. Failure to object to Dr. Keen's testimony

¶46 Dr. Buldoc performed the autopsy on Iler in 1993. During the aggravation phase of the resentencing trial, Dr. Keen testified that he had formed his own opinions about Iler's cause of death based on the autopsy report and photograph exhibits displayed at trial. Dr. Buldoc's autopsy report was not admitted. The PCR court found that counsel committed IAC by failing to object to permitting Dr. Keen to "stand[] in for someone

absent" and "provid[e] conclusions and opinions in regard to aggravators which were not his own." We reject this conclusion. Dr. Keen neither testified to any of Dr. Buldoc's conclusions, nor was he a mere "conduit" for Dr. Buldoc. *See State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989) ("if the testifying expert merely acts as a conduit for another non-testifying expert's opinion, the 'expert opinion' is hearsay and is inadmissible"). Rather, he properly testified to his own conclusions and was subjected to cross-examination.

**¶47** In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the United States Supreme Court held that out-of-court testimonial statements by witnesses are barred under the Confrontation Clause, unless the witnesses are unavailable and defendants had a prior opportunity to cross-examine those witnesses. Apparently relying on *Crawford* and its progeny, the PCR court determined that defense counsel should have objected to Dr. Keen's testimony because he did not perform the autopsy himself. Although the United States Supreme Court has declined to create a "forensic evidence" exception to *Crawford*, *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 662 (2011), the autopsy report on which Dr. Keen relied was nontestimonial and therefore not subject to the strictures of the Confrontation Clause. *See State v. Medina*, 232 Ariz. 391, 406 ¶¶ 61–62, 306 P.3d 48, 63 (2013) (autopsy report created to determine manner and cause of death is nontestimonial). Thus, objecting to his testimony would not have resulted in its preclusion.

**¶48** In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the United States Supreme Court held statements are testimonial when their primary purpose is to "establish or prove past events potentially relevant to later criminal prosecution." The subsequent plurality opinion in *Williams v. Illinois* reinforced this notion, holding that testimonial statements subject to the Confrontation Clause are "out-of-court statements having the primary purpose of accusing a *targeted* individual of engaging in criminal conduct." 132 S. Ct. 2221, 2242 (2012) (emphasis added). In his concurring opinion, Justice Thomas concluded the Confrontation Clause only extends to "formalized testimonial materials such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogues, such as custodial interrogation." *Williams*, 132 S. Ct. at 2260 (quoting *Michigan v. Bryant*, 562 U.S. 344, 379 (2011)) (internal quotation marks omitted). The

report here is nontestimonial under either the "primary purpose" test espoused by the *Williams* plurality or the "solemnity" test of Justice Thomas.

**¶49**        Informed by *Williams*, this Court has held that an autopsy report is nontestimonial when created to determine the manner and cause of death to aid in apprehending a suspect at large, rather than gathering evidence for prosecution of a known suspect. *Medina*, 232 Ariz. at 406 ¶ 62, 306 P.3d at 63. Because the autopsy report here was created for the very purpose espoused in *Medina*, we conclude it is nontestimonial and thus Dr. Keen's testimony did not violate the Confrontation Clause.

**¶50**        In addition to *Medina*'s holding regarding nontestimonial reports, this Court has held that a testifying medical examiner may offer an opinion based on the autopsy performed by a non-testifying expert without violating the Confrontation Clause so long as the examiner testifies as to his or her own conclusions, is subject to cross-examination, and the report is not admitted into evidence. *State v. Joseph*, 230 Ariz. 296, 298 ¶¶ 8–9, 283 P.3d 27, 29 (2012); *see also State v. Smith*, 215 Ariz. 221, 228 ¶ 23, 159 P.3d 531, 538 (2007) ("Expert testimony that discusses reports and opinions of another is admissible . . . if the expert reasonably relied on these matters in reaching his own conclusion."); *State v. Snelling*, 225 Ariz. 182, 187 ¶¶ 19–21, 236 P.3d 409, 414 (2010) (holding no Confrontation Clause violation occurred because the medical examiner testified that she formed her own opinions after reading the autopsy report, was confronted and cross-examined about her opinions, and the autopsy report was not admitted into evidence).

**¶51**        Because the autopsy report was nontestimonial and Dr. Keen's testimony complied with our case law, counsel had no reason to object. Thus, we need not address whether refraining from objecting to the testimony prejudiced Pandeli.

### 9. Allowing testimony of Humphreys' sister

**¶52**        The PCR court found that "allow[ing] family of prior victim to testify" constituted a colorable claim of IAC, but made no specific findings on this point. The only member of Humphreys' family who testified was her sister. Defense counsel objected to this testimony by

unsuccessfully moving to preclude it. Therefore, defense counsel was not deficient on this point.

### 10.  Failure to effectively cross-examine Chris Pandeli

¶53        During the penalty phase, Pandeli's half-brother, Chris, described Pandeli's behavior and alcohol consumption at a bar the night of Iler's murder and the night after. He also testified that Pandeli claimed to have once stabbed a black female hitchhiker and that Pandeli called Chris after his arrest and admitted to killing Iler and a black woman. Although defense counsel briefly cross-examined Chris, she did not ask whether Chris had any bias or motive for testifying against Pandeli. The PCR court found that defense counsel's failure to bring out Chris's "extremely prejudicial" biases on cross-examination constituted IAC.

¶54        At the PCR hearing, Shriver testified that he and Sinclair interviewed Chris before trial and were aware that he hated Pandeli and had no problems with a death sentence. Shriver testified that he and Sinclair specifically discussed and determined that a lengthy cross-examination of Chris would not be beneficial, but also that doing so would open the door to him letting the jury see his real feelings about Pandeli. Shriver also stated that he did not want to give Chris the opportunity to "vent," because he believed that Chris' testimony would not be "important to the jury based on what they'd already heard," and did not want to allow "another opportunity for somebody to get up and say bad stuff about [Pandeli]." Sinclair also recalled being aware that Chris blamed Pandeli for their father's health and financial problems and remembered that he possessed some sort of damaging information. Therefore, because Chris was not seen as a "key witness" and had information "that was more damaging than any cross could fix," defense counsel decided not to subject him to a lengthy cross-examination.

¶55        Defense counsel's decision not to extensively cross-examine Chris Pandeli was strategic and "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. The PCR court erred by granting relief on this issue.

### 11. Failure to request instruction on all mitigating factors

¶56 Defense counsel presented twelve categories of non-statutory mitigating circumstances to the jury encompassing at least eighty-three individual factors. Michael Reeves, Pandelli's "*Strickland* expert," testified that defense counsel should have asked for instructions on each of the individual mitigators rather than grouping them into twelve categories. The PCR court agreed, finding that defense counsel was ineffective by failing "to present individual mitigating factors for Mr. Pandeli" and "[i]nstead . . . submitt[ing] general categories of mitigators to the jury."

¶57 Counsel testified that he intended to present mitigating evidence as a general outline rather than as an exhaustive list of individual mitigators. Additionally, the jury was instructed that it could consider any factor as mitigation. The decision to organize mitigating evidence in this fashion was a strategic decision that is well within the boundaries of reasonable representation required by *Strickland*.

¶58 To the extent the PCR court suggested that counsel's decision violated Pandeli's Eighth Amendment rights, we disagree. The Eighth Amendment does not require a capital jury to be instructed on specific mitigating factors. *State v. Johnson*, 212 Ariz. 425, 437–38 ¶¶ 44–47, 133 P.3d 735, 747–48 (2006) (citing *Buchanan v. Angelone*, 522 U.S. 269, 270 (1998)). The jury was instructed that it "must consider and give effect to all mitigating circumstances that have been raised by any aspect of the evidence." We presume that jurors follow the court's instructions. *Newell*, 212 Ariz. at 403 ¶ 68, 132 P.3d at 847 (2006). The instruction satisfies *Buchanan* and counsel's presentation neither violated Pandeli's Eighth Amendment rights nor constitutes IAC.

### 12. Ineffective mitigation presentation

¶59 An issue that was not raised in the PCR petition, yet was determined by the PCR court to constitute IAC, was that the mitigation presentation was deficient. The PCR court did not make any findings or conclusions directly on this point. However, the court did find that the mitigation specialist, Barb Bumpus, had never worked on a capital case and

was not qualified to do so; the Legal Defender's Office restricted counsel's ability to perform mitigation; and counsel had no supervisory authority over mitigation personnel.

¶60 Although both Shriver and Sinclair testified that the mitigation specialist was unqualified, defendants do not have a stand-alone right to a mitigation specialist. *See Phillips v. Bradshaw*, 607 F.3d 199, 207–08 (6th Cir. 2010) ("[H]iring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel."); *State v. Herring*, 28 N.E.3d 1217, 1239 ¶ 113 (Ohio 2014) (holding defendant had no "constitutional right to a mitigation specialist or a right to an effective one"). To determine whether counsel provided ineffective assistance in this regard, the question is not whether the mitigation specialist was unqualified, but rather whether counsel fully investigated the defendant's background. *See Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003).

¶61 Indeed, Shriver testified that he was aware of *Wiggins* and that he conducted a full investigation of Pandeli's mitigation. Pandeli has not established that defense counsel failed to meet their obligation to fully investigate his background, nor does he establish that defense counsel failed to adequately present mitigation to the jury. The PCR court erred by granting relief on this ground.

### 13. Inexperience of co-counsel Sinclair

¶62 Although not raised in the PCR petition, the PCR court found that Sinclair's "inexperience . . . w[as] proven by a preponderance of the evidence." That determination was based on Sinclair's testimony that she "had never done a trial, not even a misdemeanor." Therefore, the court found that "deficits in the Petitioner's defense . . . were the result of inexperienced counsel and unprofessional judgment," which was caused because "counsel lacked the fundamental requisite understanding of the requirements for conducting a capital defense."

¶63 At the time of trial, Shriver was an experienced criminal defense attorney who had been involved in capital cases. Shriver was aware of Sinclair's relative inexperience, but obtained this Court's consent to appoint Sinclair. *See* Ariz. R. Crim. P. 6.8(d) (Supreme Court may consent

to appointment if "attorney's experience, stature and record enable the Court to conclude that the attorney's ability significantly exceeds the standards set forth in [Arizona Rule of Criminal Procedure 6.8]" and "attorney associates with himself or herself a lawyer who does meet the standards set forth in [Rule 6.8]"). He stated that Sinclair was not a "newbie, as far as [her] experience in relation to capital stuff" because she had previously "worked . . . on a capital case PCR at length." Shriver believed that Sinclair's prior experience, "intellect, [and] her desire" qualified her to be a part of the defense team under the guideline standards at the time. At the PCR hearing, Shriver testified that even today he "would not try to get Ms. Sinclair taken off a case," and that "[s]he's wonderful. She might demean[] her abilities, but she's a darn good attorney."

¶64 The relative inexperience of a second-chair defense attorney in capital trials does not in itself constitute IAC, especially when the first-chair attorney, like Sinclair, was experienced. Indeed, "[d]efendants facing the death penalty do not have a per se constitutional right to the assistance of two attorneys." *State v. Hester*, 324 S.W.3d 1, 35 (Tenn. 2010); *see also Bell v. Watkins*, 692 F.2d 999, 1009 (5th Cir. 1982) ("Although Mississippi courts may customarily appoint two lawyers in a capital case, the Constitution dictates no such requirement."); *Smith v. State*, 445 So. 2d 227, 230 (Miss. 1984) (holding that the constitution does not require the appointment of two attorneys for indigent capital defendants). This is reiterated in Committee Comment to Rule 6.8, which only *recommends* co-counsel in capital cases, but does not require multiple attorneys. Ariz. R. Crim. P. 6.8 cmt. ("The committee recommends that co-counsel be appointed at all stages of capital litigation."). Here, having a second lawyer with criminal defense and some capital case experience was of benefit to Pandeli, and the court did not tie her relative inexperience to tangible adverse consequences. The court erred by granting relief on this ground.

### 14. Failure to adequately conduct voir dire

¶65 The PCR court found defense counsel deficient for "fail[ing] to conduct voir dire of the jury." Specifically, the court found that counsel did not "ask about the prejudices and to ask specific questions, such as would you automatically give the death penalty to somebody, who has been convicted of a murder, such as in this case of a sexually charged

murder?" The record does not support the court's conclusion.

**¶66** Although Sinclair had no experience selecting juries, lead counsel Shriver had experience selecting juries in non-capital cases. Shortly after *Ring v. Arizona*, 536 U.S. 584 (2002), Shriver attended a one-day seminar on jury selection for capital cases. Shriver also testified that he positioned staff throughout the courtroom to listen to the questions presented at voir dire, write down the jury panels' responses, and attempt to rate prospective jurors.

**¶67** Counsel also filed motions to "life qualify" the jury and establish the scope of voir dire, and submitted a proposed questionnaire. In fact, the State objected to two questions counsel proposed — whether the listed types of murder (including "serial murders") are appropriate for the death penalty and one that had the proposed jurors indicate from a list of circumstances which they could consider as a basis for imposing a life sentence instead of a death sentence. Prospective jurors were also told that Pandeli had committed a prior second-degree murder before he murdered Iler and were asked whether they were "going to have problems getting past the fact that this is a second murder." They were also asked whether they would consider various categories of mitigation relevant to Pandeli.

**¶68** Pandeli did not carry his burden of proving that counsel's voir dire was deficient under the *Strickland* standard. Counsel performed competent voir dire in support of their strategy, explained by Shriver at the PCR hearing. Counsel employed a multifaceted voir dire strategy that was not demonstrably incompetent. *See Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) ("Although counsel's decision not to question prospective jurors more extensively may seem a questionable decision in hindsight, it was guided by a reasonable strategy and was not deficient performance."). We focus not on relative experience in this regard, but rather actual performance, which Pandeli has not demonstrated was ineffective. *See, e.g., LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998) ("[I]t is not the experience of the attorney that is evaluated, but rather, his performance."); *State v. Chapman*, 816 P.2d 1023, 1026 (Idaho Ct. App. 1991) ("Mere inexperience of counsel is not a sufficient basis for a claim of ineffective assistance, such claim must succeed or fail on counsel's performance, not his level of experience.").

15. **Cumulative effect of IAC**

¶**69**      This Court has not recognized the cumulative error doctrine for IAC claims as it has for prosecutorial misconduct claims. In *State v. Hughes*, this Court stated:

> At the outset, we need to clarify Arizona's position regarding the cumulative error doctrine in criminal cases. Our general rule has been stated several times over the years, and was recently stated in *State v. Dickens*, 187 Ariz. 1, 21, 926 P.2d 468, 488 (1996), as follows: "[T]his court does not recognize the so-called cumulative error doctrine." *See also State v. Roscoe*, 184 Ariz. 484, 497, 910 P.2d 635, 648 (1996); *State v. White*, 168 Ariz. 500, 508, 815 P.2d 869, 877 (1991). This lack of recognition is based on the theory that "something that is not prejudicial error in and of itself does not become such error when coupled with something else that is not prejudicial error." *Roscoe*, 184 Ariz. at 497, 910 P.2d at 648. . . .
>
> We reiterate the general rule that several non-errors and harmless errors cannot add up to one reversible error. We also clarify the fact that this general rule does not apply when the court is evaluating a claim that prosecutorial misconduct deprived defendant of a fair trial.

193 Ariz. 72, 78–79 ¶ 25, 969 P.2d 1184, 1190–91 (1998).

¶**70**      Ninth Circuit decisions establish that the cumulative effect of deficiencies may support a finding of prejudice, even when no single instance of IAC meets the prejudice standard. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("We must analyze each of his claims separately to determine whether his counsel was deficient, but prejudice may result from the cumulative impact of multiple deficiencies."); *Mak v. Blodgett*, 970

F.2d 614, 622 (9th Cir. 1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [a granting of relief].").  *But see Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998) ("Having just determined that none of counsel's actions could be considered constitutional error . . . it would be odd . . . to conclude that those same actions, when considered collectively, deprived [defendant] of a fair trial.")  Citing the Ninth Circuit cases, Pandeli argues that, even if this Court does not find deficient performance on any one individual issue, the multiple instances of IAC have cumulatively prejudiced him under *Strickland*.

**¶71**     Regardless of whether the cumulative error doctrine should be recognized in this context, the record shows no aggregate IAC occurred here.  It may be that multiple instances of non-prejudicial actions deemed inadequate by the defendant, viewed collectively, amount to IAC.  Here, however, all of the conduct at issue was within the requisite bounds of competence.  Although in hindsight counsel may have done certain things differently, their decisions all were grounded in reason or strategy and were not shown to be the product of ineptitude, inexperience, or lack of preparation.  As a result, there is no cumulative error.

**¶72**     Because the actions and decisions complained of are within the bounds of professional competence, we do not need to determine whether they prejudiced Pandeli.  *State v. Salazar*, 146 Ariz. 540, 541, 707 P.2d 944, 945 (1985).  We reverse the PCR court's conclusion that Pandeli received inadequate representation.  The cumulative decisions about which Pandeli complains do not amount to IAC.

### B.  Due Process Issue

**¶73**     The PCR court likewise erred in finding a due process violation based on testimony by the State's medical expert, Dr. Bayless, that Pandeli malingered during his cognitive tests and suffered only from an antisocial disorder rather than serious mental illness.  Specifically, the PCR court found:

> Defendant's [sic] have a right to a fair

sentencing procedure which includes the right to be sentenced on the basis of accurate information, which basic tenet was violated at this resentencing.

Defendant, it is clear, suffers from a serious mental illness (cerebral dysfunction and impaired frontal lobes) but the jury was told he had an anti-social personality disorder and was a malingerer.

¶74 The PCR court implied that the jury must be given only objectively accurate expert testimony and that the court is the arbiter of that accuracy. It is a tall order to establish that expert opinions are objectively "inaccurate" and even taller to establish they are so wrong that merely asserting them makes a sentencing procedure so unfair as to violate due process. *See State v. Goudeau*, 239 Ariz. 421, 443 ¶ 50, 372 P.3d 945, 967 (2016) ("Generally a defendant's due process rights are sufficiently protected by the opportunity to cross-examine the state's expert regarding the validity of the testing procedures."). We note that opinion testimony often includes subjective components, and good faith disagreements among credible experts are not unusual and do not necessarily amount to a due process violation. *See In re Richards*, 289 P.3d 860, 872 (Cal. 2012). To the contrary, they are the core of our adversarial process.

¶75 The PCR court relied on *United States v. Tucker*, 404 U.S. 443, 446–47 (1972), and *State v. Grier*, 146 Ariz. 511, 516, 707 P.2d 309, 314 (1985) for support that Pandeli's due process rights were violated by Dr. Bayless's testimony. But *Tucker* and *Grier* dealt with objectively erroneous facts rather than subjective opinions given by an expert, and are not applicable. *See Tucker*, 404 U.S. at 447 (trial court relied on three prior convictions in imposing sentence but two convictions were invalid); *Grier*, 146 Ariz. at 515–17, 707 P.2d at 313–15 (sentencing court and examining doctors relied on a presentence report that included an erroneous rap sheet).

¶76 The circumstances here are distinguishable from *Tucker* and *Grier*. The PCR court did not find that Dr. Bayless relied on any inaccurate facts to arrive at his opinions; the court simply disagreed with those

opinions. However, a defendant's due process rights are not violated by a good-faith "battle of the experts." That Pandeli's experts disagreed with Dr. Bayless's diagnosis merely goes to the weight and credibility of Dr. Bayless's opinion, matters reserved for the fact-finder's consideration and determination. *See State v. Romero*, 239 Ariz. 6, 12 ¶ 27, 365 P.3d 358, 364 (2016) ("[W]e have recognized that a trial court's admission of disputed expert testimony leaves to the fact-finder the role of assessing its weight and credibility."); *see also State v. Lajeunesse*, 27 Ariz. App. 363, 368, 555 P.2d 120, 125 (1976) (finding that disputed facts in the case "were either not relied upon by [the expert] in reaching his opinion, or were immaterial to his opinion, or were legitimately contested facts and evidence . . . that supported [the expert's] version," and that the trial court properly left it to the jury to assign weight to that testimony). An expert's opinion is not "false" merely because another expert — or the court — disagrees with it. To hold otherwise would destroy any trial process involving conflicting expert opinions and improperly substitute judge for jury.

¶77 Pandeli argues his due process rights were violated not because there was a disagreement between each party's experts but because the other experts "demonstrated that crucial portions of Bayless's testimony were either significantly misleading to the jury, based on incorrect application or interpretation of established psychological principles, or were outright false." Pandeli claims Dr. Bayless misled the jury by testifying that Pandeli was malingering and that Zoloft and Prozac have no application in the treatment of Attention Deficit Hyperactivity Disorder ("ADHD"), and by conflating Antisocial Personality Disorder with psychopathy. This argument fails because Pandeli has provided no objective evidence that Dr. Bayless's testimony was false or misleading.

¶78 Dr. Bayless did not present objectively false or misleading testimony that he believed Pandeli was malingering during his evaluation. Pandeli cites Dr. Weinstein's testimony at the PCR hearing for support that Dr. Bayless's testimony was "unmoored from any factual, scientific basis," and "[s]uch uncorrected, unscientific testimony from an expert witness created at a minimum a grave risk that the sentencing jury was misled." However, Dr. Weinstein testified that Dr. Bayless did not use any tests that directly measured effort, which brought him to the conclusion that "if you don't have any objective way of finding out whether they are or [are] not

making any good effort, then it is very difficult to say based on X. Y. Z., I think he is or he is not malingering." Dr. Weinstein did not state that Dr. Bayless was objectively wrong, but rather that it would be difficult to determine whether Pandeli was malingering without specific tests designed to determine effort. This is a difference of opinion between two experts and does not violate Pandeli's due process rights.

¶79    Nor did Dr. Bayless present objectively false or misleading testimony when he stated that Zoloft and Prozac have no application for treatment of ADHD. Pandeli cites Dr. Jones's testimony at the PCR hearing for support that Dr. Bayless's conclusion that Zoloft and Prozac have no application for treatment of ADHD was false. However, Dr. Jones's only analysis on the subject was the general conclusion "[t]hat [it] is not true" that the medications did not have any application for treatment for ADHD. No other evidence was presented on this subject. In short, one expert stated the medications had no application for the treatment of ADHD and another said they do. It was up to the jurors to determine which expert's testimony they believed and chose to accept. *See Lajeunesse*, 27 Ariz. App. at 368, 555 P.2d at 125. This too was merely a difference of opinion between two experts and does not constitute a violation of Pandeli's due process rights.

¶80    Finally, Dr. Bayless did not present objectively false or misleading testimony when he discussed Antisocial Personality Disorder and psychopathy. Pandeli relies on Dr. Jones's testimony at the PCR hearing that Dr. Bayless incorrectly conflated the two disorders at trial, and thus presented false and misleading testimony to the jury. However, this is not supported by the record. When Pandeli's PCR counsel asked Dr. Jones, "So it sounds like you are saying [Dr. Bayless's] diagnosis of Mr. Pandeli with antisocial personality disorder was incorrect, based on what he did?" Dr. Jones only replied, "Well, there's an inconsistency in the testimony and with the statement that Dr. Bayless presented and the diagnosis that he presented." This again reflects a difference of opinion between two experts and does not constitute a violation of Pandeli's due process rights.

**CONCLUSION**

¶81      For the foregoing reasons, we reverse the ruling of the PCR court and reinstate Pandeli's death sentence.