NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

LARRY NORRINGTON, *Appellant.*

No. 1 CA-CR 19-0171
FILED 3-24-2020

Appeal from the Superior Court in Maricopa County
No. CR2017-147514-001
The Honorable John Christian Rea, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michelle L. Hogan
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Scott L. Boncoskey
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the decision of the Court, in which Judge Jennifer B. Campbell and Vice Chief Judge Kent E. Cattani joined.

**M c M U R D I E**, Judge:

**¶1**        Larry Norrington appeals his convictions and sentences for one count of taking the identity of another, and one count of theft of a credit card or obtaining a credit card by fraudulent means. For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND[1]

**¶2**        In the summer of 2017, Norrington worked for a private security company as a guard and was assigned to provide security-related services to a residential community in Scottsdale. Norrington worked in a guardhouse located at the entrance to the community, and his primary job responsibilities included monitoring individuals entering and exiting the community and supervising the company's other employees. Because Norrington worked the morning shift, he was also required to sort the residents' mail, which his supervisor delivered every morning.

**¶3**        In August 2017, J.T., a resident in the community where Norrington worked, noticed charges on his bank account that he had not made and reported the activity to the Scottsdale Police Department. He told the police that he suspected Norrington of stealing his mail. The police department referred the complaint to the United States Postal Service, which had been receiving complaints of lost or stolen mail from the community for some time. Traci Long, a Postal Inspector with United States Post Office, was notified of J.T.'s report.

**¶4**        Long contacted Tracy Real, a fraud investigator working for J.T.'s bank. After reviewing the bank's internal records, Real confirmed that

---

[1]        We view the facts in the light most favorable to upholding the verdicts and resolve all reasonable inferences against the defendant. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

a replacement debit card sent by the bank had been successfully activated on July 17, 2017. The records also showed that two withdrawals using the card had been attempted, but denied, at a branch of a different bank located near the residential community on the evening of July 20, 2017. Real provided Long with the phone number used to activate the card and the location of the branch where the attempted transactions occurred.

¶5            As she continued to investigate the circumstances surrounding the theft and misuse of J.T.'s debit card, Long learned that the phone number used to activate the card was connected to the guardhouse where Norrington worked. Long also acquired images taken by a video surveillance system in place at the bank branch where the July 20 transactions occurred. In the surveillance images, an individual wearing a mask over his face, earrings, and a necklace can be seen approaching and using the ATM. The man removed the mask while looking to the side and looking down, revealing some of his facial features in profile. When Long compared these images with Norrington's driver's license photograph, Long concluded Norrington was the individual in the surveillance images. She later reaffirmed this identification by observing Norrington while driving past the guardhouse.

¶6            In October 2017, Long and two other law enforcement officers contacted, detained, and questioned Norrington. During the interview, Long showed Norrington the surveillance images. Norrington denied that he was the individual shown in the images but acknowledged that the individual looked like him. Norrington also confirmed that he was responsible for sorting the mail received at the guardhouse when the debit card was activated. At the end of the interview, Long arrested Norrington. As part of the booking process, Long removed Norrington's jewelry—a pair of earrings and a necklace—and photographed him.

¶7            The State charged Norrington with three counts each of theft of a credit card or obtaining a credit card by fraudulent means, class 5 felonies, and taking the identity of another, class 4 felonies, for the attempted withdrawals and other incidents involving the use of J.T.'s debit card. In July 2018, a four-day trial was held. After the State's case, Norrington moved for a judgment of acquittal. After hearing argument from the parties, the court granted the motion on two of the counts. The jury deadlocked on the remaining counts, and the court declared a mistrial. The State elected to retry Norrington and dismissed the counts related to other incidents, leaving only one count for each offense related to the July 20, 2017, attempted withdrawals.

¶8            In February 2019, the court conducted a retrial. During the retrial, the State admitted into evidence the surveillance images, Norrington's driver's license photograph, the jewelry removed from him during his arrest, and the photograph of Norrington taken after his arrest. The State also called Long to testify. After discussing her investigation into the theft and misuse of J.T.'s debit card, the State asked Long who she believed was the individual shown in the surveillance images. Long answered that she believed it was Norrington and explained how she arrived at that conclusion. The State then asked Long again whether she thought Norrington was the individual in the surveillance images. Norrington objected, citing a lack of foundation. The court overruled the objection and permitted Long to identify Norrington as the individual in each of the surveillance images admitted into evidence by the State. During the defense's case, Norrington elected to testify and denied that he was the individual in the surveillance images.

¶9            The jury found Norrington guilty as charged. At sentencing, the court suspended the imposition of the sentences and placed Norrington on concurrent probation terms totaling three years. Norrington appealed, and we have jurisdiction under Arizona Revised Statutes sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

¶10            Norrington argues the superior court erred by permitting Long to offer her lay opinion identifying Norrington in the surveillance images under Arizona Rule of Evidence ("Rule") 701, which governs the admissibility of opinion testimony by lay witnesses. Specifically, Norrington contends Long's opinion did not meet the second requirement of the rule—that the opinion is "helpful to clearly understanding the witness's testimony or to determining a fact in issue," Ariz. R. Crim. P. 701(b). In his view, Long was in no better position than the jury to identify him in the images.

¶11            "The question of whether a lay witness is qualified to testify as to any matter of opinion is a preliminary determination within the sound discretion of the trial court whose decision must be upheld unless shown to be clearly erroneous or an abuse of discretion." *State v. Fuentes*, 247 Ariz. 516, 524, ¶ 28 (App. 2019) (quoting *Groener v. Briehl*, 135 Ariz. 395, 398 (App. 1983)).

¶12            Rule 701 provides that a lay witness may testify in the form of an opinion if that opinion is:

4

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

If the requirements of Rule 701 are met, a lay witness may offer an opinion concerning the identity of a person in an image or photograph. *See State v. King*, 180 Ariz. 268, 280 (1994).

**¶13** Whether such lay witness identification testimony is "helpful" within the meaning of Rule 701 "depends on the totality of the circumstances," including:

> the witness's familiarity with the defendant's appearance at the time the crime was committed, the witness's familiarity with the defendant's customary manner of dress, insofar as such information related to the clothing of the person depicted in the surveillance photograph, whether the defendant disguised his or her appearance during the offense or altered his or her appearance before trial, and whether the witness knew the defendant over time and in a variety of circumstances, such that the witness's lay identification testimony offered to the jury a perspective it could not acquire in its limited exposure to the defendant.

*United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (citations omitted) (quotations omitted); *accord United States v. Fulton*, 837 F.3d 281, 297 (3d Cir. 2016); *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008); *see also* Fed. R. Evid. 701 (mirroring Arizona Rule of Evidence 701); *State v. Winegardner*, 243 Ariz. 482, 485, ¶ 8 (2018) ("When an Arizona evidentiary rule mirrors the corresponding federal rule, we look to federal law for guidance."). However, "[t]he absence of any single factor will not render testimony inadmissible because cross-examination exists to highlight potential weaknesses in lay opinion testimony." *Beck*, 413 F.3d at 1015. In other words, so long as "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury," the testimony is admissible. *Contreras*, 536 F.3d at 1170 (quoting *United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986), *vacated on other grounds*, 479 U.S. 1077 (1987)); *see also United States v. Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995) (opinion testimony identifying defendant in photographs is admissible when "witness possesses sufficiently relevant familiarity with

the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification").

**¶14**      Considering the totality of the circumstances, the superior court did not abuse its discretion by concluding Long's encounters with Norrington provided a basis on which Long was more likely to identify Norrington in the surveillance images than the jury. Long personally encountered Norrington twice during her investigation, once while driving by the guardhouse of the residential community where Norrington worked and a second time while interviewing him just before his arrest. Although these interactions were post-offense and for an unknown duration, they were still much closer in time to the date of the crime than during trial when the jurors observed Norrington.

**¶15**      Given these facts, Long's opinion helped determine a core fact at issue in this case—the identity of the individual in the surveillance images. Accordingly, the court did not abuse its discretion by admitting Long's identification testimony.

**¶16**      Even assuming *arguendo* that Long was in no better position to accurately identify Norrington than the jury and permitting the testimony under Rule 701 was error, it was harmless beyond a reasonable doubt in this case. Long's identifications were cumulative of other evidence offered by the State. *See State v. Murray*, 247 Ariz. 447, 452–53, ¶ 12 (App. 2019) (erroneous introduction of evidence harmless if cumulative of other evidence). Before her testimony, the State called Norrington's former supervisor at the private security company, who testified that he interacted with Norrington almost every day for several years, including when the offenses occurred. The supervisor then also identified Norrington in some of the same surveillance images and explained why he believed the individual was Norrington. The State also introduced substantial circumstantial evidence to support the identification testimony, including evidence that the call activating J.T.'s debit card came from the guardhouse during Norrington's shift and Norrington was responsible for handling the residents' mail. Finally, Norrington himself even acknowledged that the person in the images looked like him.

**¶17**      The alleged error here was also harmless because the jury could compare the surveillance images with other photographs Long utilized in her investigation and with its observations of Norrington at trial. The jury was thus "permitted to reach its own conclusion as to the similarity or dissimilarity" between the individual shown in the surveillance images

and Norrington. *State v. Amaya-Ruiz*, 166 Ariz. 152, 168 (1990) (concluding witness' opinions of similarity between footprint and defendant's shoe were harmless because the jury could compare the print and shoe for themselves). And although Norrington contends Long's testimony could have unduly influenced the jury because she was a law enforcement officer, the jury was explicitly instructed that they were "to consider the testimony of a police officer just as [they] would the testimony of any other witness," and we presume jurors follow their instructions. *State v. Pandeli*, 242 Ariz. 175, 189, ¶ 58 (2017).

## CONCLUSION

**¶18**     We affirm Norrington's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:  AA